## Willie Monroe v. The State.

### No. 2786. Decided June 15, 1904.

**1.—Charge of the Court—Concealment—Principal.**

Where the statement of the defendant showed that he was present at the homicide, but did not participate therein by acts, words or gestures, but that it was committed by another, and the evidence further showed that he concealed the offense for a time, the court should have instructed the jury that they must acquit him regardless of such concealment; if they believe or have a reasonable doubt that he did not aid in the homicide.

**2.—Same—Self-Defense Not an Issue—Error to Charge.**

Where the evidence does not raise the issue of self-defense, it is error to charge on same, as such a charge was calculated to unduly involve appellant and prejudice his rights.

**3.—Evidence—Not Sufficient to Convict.**

Where the only affirmative evidence of the homicide was the statement of the defendant, which exculpates him, and is not overcome by the physical facts, or negatived by other circumstances, a conviction can not be sustained.

Appeal from the District Court of Pecos.    Tried below before Hon. B. C. Thomas.

Appeal from a conviction of murder in the second degree; penalty, seven years in the penitentiary.

The opinion states the case.

*Walter Gillis* and *W. M. Peticolas,* for appellant.—In view of the state of the testimony in this case, the court erred in failing to instruct the jury that inasmuch as the State introduced in evidence upon the trial of this cause the statement or declaration of defendant made to W. I. Cates to the effect that deceased was killed by Oliver Seeley, and that, though present at the time, he, the defendant, had nothing to do with the killing, that the State was bound by such declaration, and that the defendant should be acquitted, unless they further found that said statement or declaration was improbable upon its face, or was inconsistent with, or contradicted by other testimony in the case.   Jones v. State, 29 Texas, Crim. App., 20; Pharr v. State, 7 Texas Crim. App., 472; Roscoe's Crim. Ev., p. 55; 1 Greenleaf on Ev., sec. 218; Maines v. State, 23 Texas Crim. App., 568; Barton v. State, 28 Texas Crim. App., 483; Willis v. State, 24 Texas Crim. App., 584; Walker v. State, 29 Texas Crim. App., 621; Robins v. State, 9 Texas Crim. App., 671.

On question of charge on self-defense:   White's Code Crim. Proc., art. 817; sec. 2; Id., arts. 715, 723; Stewart v. State, 15 Texas Crim. App., 598; Hawthorne v. State, 28 Texas Crim. App., 212; Ford v. State, 41 Texas Crim. Rep., 1; Burks v. State, 40 Texas Crim. Rep., 167.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of seven years; and prosecutes this appeal.

The facts presented in this record show substantially that deceased, Will R. Herren, was shot and killed on the 9th of February, 1904, in his pasture about a mile and a half from his house; that Willie Monroe and Oliver Seeley were the only persons present at the time he was killed. The killing occurred about 10 o'clock in the forenoon, and deceased's horse came back to his home about 3 o'clock in the afternoon.   Late that evening Oliver Seeley, who was also indicted for the same offense, went to the town of Sheffield and reported to the officers that he had killed deceased, and surrendered; he went with the officers that night to point out the body, but was unable to find it, but the body was found early the next morning.   It was shown by the State that there was some friction existing between appellant and Seeley on the one side and deceased on the other with reference to some cattle.   It appears that John Monroe, father of appallent Willie Monroe, and the father-in-law of Oliver Seeley, had bought 100 head of THS cattle that formerly run in the pasture of deceased; and they were taken by John Monroe and placed in an ad-

joining pasture, and some fifteen head of the same THS cattle were left in the possession of deceased, who claimed them on account of pasturage. It was claimed by Monroe that after he placed the cattle he purchased in the adjoining pasture some of them got through the fence into deceased's pasture; and the Monroes had gone into said pasture after their cattle, and some accusations were made by deceased against the Monroes on account of said cattle. And it is shown that Willie Monroe stated to another party, a short time before the homicide, that he understood deceased had charged him with stealing some of the THS cattle, and that if he did not stop talking about him he would go down to his house and wear him out with a rope. About 8 o'clock on the morning of the homicide, Willie Monroe and Oliver Seeley were seen going into the pasture, and in the direction of where the homicide occurred. Deceased left home some time after that, going in the same direction; and his body was found, as stated in his pasture about a mile and a half from his house. Tracks of two horses were found leading to and from where the homicide occurred. They approached where deceased and his horse evidently were, in a walk, and left there, in the same general direction in a run. Immediately surrounding the place of the homicide it seems a number of horses' tracks were found on the ground; so numerous were the tracks one could not be discerned from another. Deceased was armed when he left home that morning with a winchester rifle, and that was found on the ground near him. It had not been discharged. His horse was shown to have run from the place where the killing occurred and was traced some distance. It came home about 3 o'clock in the afternoon. Some blood was found on the saddle. Deceased's wife immediately got on his horse, went in the same direction her husband had gone that morning, but failed to find the body. When the body was found an autopsy showed he had been shot evidently with a 41-caliber pistol twice, once in the left side, breaking his fourth rib and going through his lungs and coming out on the right side of his body. The other shot was in his back, near his left shoulder blade, entering his backbone or spinal column. The physicians pronounced both shots fatal. The shot in the side not immediately fatal, but the one in the back instantly fatal. As stated above, Oliver Seeley reported the killing late that evening or night and surrendered to the officers. Appellant Willie Monroe testified as a witness on Seeley's trial, and was not arrested until some eight or ten days afterwards. He testified on his trial, substantially, that he and Oliver Seeley on the morning of the homicide passed the house of deceased and went into his pasture, looking for some of the THS cattle which had strayed into that pasture; that after they had been in the pasture some time and gone to several bunches of cattle, they saw deceased, who hailed them, and they rode to meet him; that when they approached him after they had said "good morning," deceased wanted to know where those THS cattle were that Oliver stole. Oliver told him if he said he stole them cattle he was a God-damn liar. Herren then pulled his gun out of scabbard and pointed it in Oliver's face, and Oliver knocked it off with

his right hand, and jerked his pistol out of his pocket and shot him with his left hand.   When this shot was fired Herren's horse jumped forward and Herren tried to turn around and shoot Oliver, and Oliver shot him again, and Herron fell off his horse.   He further stated that he (appellant) had nothing to do with the killing, and did not know it was going to occur; that he was not armed at the time and did not fire any shot; that after the shooting they were scared and did not know what to do, and loped off to his father's headquarter ranch, which was about seven or eight miles, to ask him what was best to do; that his father had not gotten back home from San Angelo; that they then went to Oliver Seeley's home, which was about two miles from deceased's house, and that Oliver Seeley went on to Sheffield and gave himself up and that he (appellant) stayed at Seeley's that night; that appellant did not own any pistol at the time and had none with him, nor did he have any arms of any kind.   He admitted having conversation with Cates at Sheffield two or three weeks before the killing; that Cates told him Will Herren accused him of roping and crippling his cattle, and that he told Cates if Herren did not quit telling lies on him, he would whip him with a rope. It is further shown that appellant had a 41-caliber Colt's pistol at the time he was arrested, some ten days after the homicide; but this was explained by showing it was a pistol of his father's, and that his father had that pistol at the time of the homicide, on his trip to San Angelo. He also testified that Oliver Seeley was armed with a 41-caliber pistol on the morning of the homicide, and had a 30-30 winchester gun on his saddle.   This is a substantial statement of all the material facts in this record.

The only questions presented by appellant relate to the charge of the court and the refusal of the court to give certain requested special instructions, and to the sufficiency of the evidence to sustain the verdict. The court gave a charge on murder in the first and second degrees and manslaughter, and also on the doctrine of principals; and instructed the jury with reference to self-defense.   The principal complaint of appellant with reference to the charge is, because the court failed to present in the main charge that phase of the case which would exonerate appellant from any offense based on the mere presence of appellant, in the absence of any act of aid, or participation in the killing.   This is true of the court's charge.   While the court did require the jury to believe, in order to convict defendant, that he must have done some act to encourage or aid appellant in committing the homicide, yet this is an affirmative charge authorizing conviction.   Nowhere did the court give the negative of this theory.   However, on appellant's request, the court did instruct the jury, as follows: "You are instructed that, if Oliver Seeley shot and killed deceased, and if you further find that defendant, though present at the time and place of such killing, did not participate or aid in such killing, or if you have a reasonable doubt as to whether or not defendant participated or aided in such killing, then and in that event you will acquit defendant; and this even though you may further find from the

evidence that such killing upon the part of said Oliver Seeley was done in such manner and under such circumstances as to render the said Oliver Seeley guilty of either murder or manslaughter." In our view this charge adequately covered the hiatus in the court's charge as far as it went. However, appellant requested another special instruction which was not given. This instruction, though not entirely correct, as it appears to predicate appellant's defense on singling out the fact of his failure to report the killing to the officers, or the wife of deceased; yet, in our opinion, it served to suggest to the court a phase of the case which should have been given; that is, the court should have instructed the jury that, before they could convict defendant of any offense, if they believed that Seeley shot and killed deceased, they must believe beyond a reasonable doubt that appellant aided the said Seeley by acts or encouraged him by words, or aided and encouraged him by both acts and words, before they could convict him; and the mere fact that he concealed the offense for a time, and failed to report the killing, if they believed he did so, would not make him guilty of any offense.

Appellant also insists that the court committed an error in giving a charge presenting the theory of self-defense, in case the jury believed that appellant killed deceased. The contention being that there is no evidence in the record upon which to base such a charge. We agree to this contention. We find nowhere in the record any testimony indicating self-defense predicated on the idea that appellant shot and killed deceased. In the absence of testimony, a charge of this character was calculated to involve appellant unduly, and prejudice his rights with the jury.

However, as we view this record, it is not necessary to discuss the errors of omission or commission in the court's charge, because behind this matter, we do not believe the State has made any case against appellant. We have heretofore recounted the essential features of the testimony, and to our minds it is clear that, aside from appellant's own evidence, the State has failed to make a case against appellant. Neither the surrounding circumstances nor the physical facts on the ground, as testified to by the witnesses, in connection with the wounds inflicted on deceased, make a case against appellant, much less do they negative, or in any measure overcome the facts of the transaction as given by him. Indeed, the facts presented in the State's case entirely harmonize with those given by the appellant. There are cases in which homicides have been committed, with no one present but defendant, in which convictions have been had and sustained, notwithstanding his testimony made a complete defense; but in all such cases it will be found that the physical facts and other circumstances of the case negatived and overcome in an affirmative way the account given by him. As this record is presented to us, there is no affirmative testimony against appellant of an inculpatory character, and his own testimony entirely exculpates him. Indeed, the evidence does not create a strong suspicion against him; and a conviction can not be sustained on even a strong suspicion. The law requires that there be

legal and competent evidence of an affirmative character showing that appellant participated in the offense charged. Unless such evidence is adduced on the trial, the conviction can not be sustained.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*