**Eugenio PESINA, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–95–00706–CR.**

Court of Appeals of Texas, San Antonio.

June 18, 1997.

Warren Weir, Weir & Alvarado, P.C., San Antonio, for Appellant.

Robert Boyd Padgett, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before RICKHOFF, STONE and JOHN F. ONION, Jr.[1], JJ.

## OPINION

JOHN F. ONION, Jr., Justice (Assigned).

This appeal is taken from a conviction for murder. *See* TEX. PENAL CODE ANN. § 19.02(a)(1) (Vernon 1994)[2]. After the jury found appellant, Eugenio Pesina, Jr., guilty as charged in the indictment, the trial court assessed punishment at 35 years' imprisonment.

### *POINTS OF ERROR*

Appellant advances twelve points of error. Although labeled as jury charge error, the real thrust of the first six points of error is a challenge to the sufficiency of the evidence to sustain the conviction either as a primary actor or as a party to the offense charged. The six points have been briefed as sufficiency questions and we shall consider them as such. In the seventh point of error, appellant complains that the trial court improperly applied the law of the parties in its jury charge and authorized conviction as a party for designated acts which occurred after the completion of the offense and not prior to or contemporaneous with the offense of murder. In the eighth, ninth, and tenth points of error, appellant contends that the erroneous application of the law of parties to the facts in the court's charge deprived him of the due course of the law under the Texas Constitution, and of the due process of law and the right to a fair trial under the Fourteenth Amendment. Amend. XIV, U.S. CONST. In the eleventh and twelfth points of error, appellant argues that since the trial court authorized his conviction either for "acting alone" or as a party, he was deprived of a unanimous verdict on one theory or the other in violation of his federal and state constitutional rights.

### *THE INDICTMENT*

The indictment charged in pertinent part that appellant, on or about June 4, 1994, "did then and there intentionally and knowingly cause the death of an individual, Keith Eugene Barabe, hereinafter referred to as complainant[3], by stabbing the said complainant with a deadly weapon, namely: a fork, that in the manner of its use and intended use was capable of causing death and serious bodily injury." The indictment also alleged a prior

---

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas.

2. The current code is cited for convenience. It is unchanged from the law in effect at the time of the commission of the offense. Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 913, *amended by* Act of May 28, 1973, 63rd Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws, 1123 (amended 1993) (current version TEX. PENAL CODE § 19.01(a)(1) (Vernon 1994)).

3. The use of the term "complainant" in indictments, briefs, and court opinions as referring to the victim of a murder is highly questionable. A "complainant" is one who applies to the court for legal redress by filing a complaint (i.e., plaintiff). Also, one who instigates prosecution or who prefers an accusation against a suspected person. *See* BLACK'S LAW DICTIONARY 285 (6th ed.1990). WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 464 (1986) defines "complainant" as "1) the party who makes the complaint in a legal action or proceeding." *See also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 272 (1973). These definitions hardly fit the description of a deceased in a murder case.

felony conviction which was not pursued by the State and thus was abandoned.

■ There was no allegation in the indictment charging appellant as a party. It was unnecessary because the law of parties may be applied to a case even though no such allegation is contained in the indictment. *Jackson v. State*, 898 S.W.2d 896, 898 (Tex. Crim.App.1995); *Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App.1985), *cert. denied*, 476 U.S. 1101, 106 S.Ct. 1942, 90 L.Ed.2d 352 (1986); *Williams v. State*, 676 S.W.2d 399, 401 (Tex.Crim.App.1984); *Pitts v. State*, 569 S.W.2d 898, 900 (Tex.Crim.App. 1978).

The State's primary theory of the case from voir dire examination of the jury panel through final jury argument was that appellant was guilty as a party.

## PRIMARY ACTOR

We turn first to the legal sufficiency of the evidence issue and determine whether the evidence was sufficient to sustain appellant's conviction for murder "acting alone" or as a primary actor.

## STANDARD OF REVIEW

In analyzing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979); *Turro v. State*, 867 S.W.2d 43, 47 (Tex.Crim.App. 1993). This standard of review applies to both direct and circumstantial evidence cases. *Green v. State*, 840 S.W.2d 394, 401 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993); *Geesa v. State*, 820 S.W.2d 154, 160–61 (Tex. Crim.App.1991). In our review, we must consider all the evidence whether rightly or wrongly admitted. *Nickerson v. State*, 810 S.W.2d 398, 400 (Tex.Crim.App.1991).

Moreover, the sufficiency of the evidence must be considered in the light most favorable to the jury's verdict by comparing the evidence to the indictment as incorporated in the court's charge and measured against the theory of the offense submitted to the jury. *See Fisher v. State*, 887 S.W.2d 49, 55 (Tex. Crim.App.1994); *Jones v. State*, 815 S.W.2d 667, 668 (Tex.Crim.App.1991); *Nickerson v. State*, 782 S.W.2d 887, 891 (Tex.Crim.App. 1990); *Boozer v. State*, 717 S.W.2d 608, 610–11 (Tex.Crim.App.1984); *Benson v. State*, 661 S.W.2d 708, 715 (Tex.Crim.App.1982), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984).

■ The jury's verdict must stand unless the verdict is irrational or unsupported by more than a "mere modicum" of evidence. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim.App.1988); *see Haddad v. State*, 860 S.W.2d 947, 950 (Tex.App.—Dallas 1993, pet. ref'd). The proof offered may be by direct or circumstantial evidence. In a circumstantial evidence case, proof amounting only to a strong suspicion is not enough. *Vaughn v. State*, 607 S.W.2d 914, 921 (Tex.Crim.App. 1980). Nevertheless, every fact need not point directly and independently to the accused's guilt; a conclusion of guilt can rest on the combined and cumulative force of all incriminating circumstances. *Vanderbilt v. State*, 629 S.W.2d 709, 716 (Tex.Crim.App. 1981), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982).

## THE FACTS

Eugene Barabe, Jr., the father of the victim, Keith Eugene Barabe, testified that he last saw his twenty-five year old son in Pleasanton about 8:30 in the morning of June 4, 1994, as his son was "heading into the bank where he does banking." He described his son as wearing a gold necklace and a gold bracelet. At the time, the elder Barabe observed his son's dog, "Sheba," a black Pomeranian, in the son's car, a blue 1986 Oldsmobile Delta 88. The witness later learned that his son had withdrawn $140 from the bank on the morning in question.

The blood-crusted and ant-covered body of Keith Eugene Barabe was found by the police in the backyard of appellant's residence at 707 Chihuahua in San Antonio after appellant had called 911 about 11:47 p.m. on June 4, 1994. San Antonio Police Officer Randy

Walter was the first officer to arrive at the scene. Appellant led the officer to the body and stated that he investigated after hearing "a noise in the back" and saw several individuals running from the yard, leaving the body behind. Officer Walter saw a trail of blood from the back porch to the body and blood on the grass and on the porch itself. The shirt of the victim was rolled up under his armpits and the victim's face was bloody and swollen. There were no shoes on the body, only one sock. Walter described appellant as very cooperative and stated that appellant signed a form giving consent to search the house.

Detective Menefee arrived shortly after the original call. Appellant told Menefee that the victim had not been in the house and he denied any knowledge of the offense or how blood had gotten on the porch or in the house. Menefee was suspicious about the traces of blood he saw on appellant's pants up to his knees, although appellant explained that he had been walking through the bloody grass six to eight inches tall. Detective Menefee also described appellant as being cooperative. He did not consider appellant intoxicated. Later, Menefee was approached by a neighbor, Ruben Vera, Jr., and as a result of their conversation, a nearby dumpster was searched and certain items belonging to the victim were recovered.

Jose Luis Aleman, a city paramedic, arrived at the scene. He found no signs of life in the body of the victim. Appellant told Aleman that he did not know the victim and had not seen anyone else in the backyard.

Detective Clay Gill had the responsibility of collecting evidence. He testified that most of the blood in appellant's house was found in the kitchen. Blood was seen on a cart across from the kitchen sink and on items situated on the cart. Other blood was observed on the floor of the hallway and of a back bedroom, on the door to another bedroom, and on the interior wall of the living room. Detective Gill was of the opinion that a struggle took place inside the house, that there was a "big bloody mess" and there had been only a "halfhearted" attempt to clean it up.

In addition to beer cans, Gill found in the kitchen sink a bent kitchen knife and a chrome barbeque or meat fork with a plastic handle. Both prongs of the fork were bent and twisted. In the dumpster across from appellant's house, a number of items were discovered, including two bloody Rockport tennis shoes, a bloody bedspread and towel, and a nylon wallet. Officer Gill took appellant's boots and blue jeans, both containing traces of what appeared to be blood. There was also hair on the toes of the boots. Gill was unable to obtain fingerprints from the knife or fork or from the items found in the dumpster. The search of the house did not reveal any money, narcotics, or gold jewelry. Appellant was arrested and taken to jail.

Several hours later, about 2:21 a.m. on June 5, 1994, a traffic accident report was received. A car hit a utility pole and turned over. The driver, Robert "Beto" Guerrero, was injured. The passenger was Jose Luis Moreno. The car was a "gray" four door 1986 Oldsmobile Delta 88 registered to Keith Barabe, the victim in the instant case. Fingerprints and blood samples were taken from the vehicle.

Dr. Robert Bux, a deputy medical examiner for Bexar County, performed the autopsy on Keith Barabe. The doctor found abrasions on Barabe's chest and abdomen which had occurred after death and which were consistent with "drag marks." There were bruises, abrasions, and scrapes on various parts of the victim's body. Injuries on the arms and hands were consistent with defensive wounds. There was a large bruise involving the entire right side of the face. The bruises to the head were apparently caused by a blunt object such as a fist or a shoe.

Dr. Bux found the cause of death to be sanguination, a bleeding to death resulting from a small wound in the neck caused by a small sharp instrument. The instrument had gone through the right jugular vein, the right carotid artery, and upon a second jab, through the left jugular vein. Dr. Bux expressed the opinion that there had been massive bleeding outside the body and that death would have resulted within a few minutes of the injury. Dr. Bux was also of the opinion that the meat fork found in the kitchen sink was capable of having caused the single stab

wound to the neck and that the fork would qualify as a deadly weapon in the manner of its use or intended use if the fork had been used to produce the injury sustained by the victim.

On cross-examination, it was established that the two prongs on the fork were each two inches in length and three-quarters of an inch apart and that when found, the prongs were bent and twisted. When asked why there were not two puncture wounds if the fork had been used in its normal configuration and in a stabbing motion, Dr. Bux explained that, "You can aim and half miss. That's all I am saying." He stated that the injury could not have been inflicted in the "ordinary knife style," but you could have "come across like this or gouge like that ... in a contorted way." Dr. Bux pointed to other abrasions on the neck in an S shape that may have resulted from the second prong. He explained that if the particular fork was the murder weapon, it was his thought that the fork's prongs had been bent and twisted after the offense was committed.

The time of death was placed as late as 10:30 p.m. and as early as 6:30 p.m. The toxicology report revealed cocaine in the victim's blood. Dr. Bux was of the opinion that the victim was not "high" at the time of death, but he had been "high" in the afternoon.

Lonnie Ginsberg, a forensic serologist, tested 25 to 30 items to determine if the victim's blood was present. He testified that he matched the victim's blood with the blood on a bedspread, towel, one tennis shoe, and some socks recovered from the dumpster as well as with the blood stain on the back porch. There was human blood on appellant's boots, but it did not show the type of enzyme activity necessary to show a match with the victim's blood and was marked "no activity." Certain other items showed the presence of blood but the amount was insufficient to determine if it was human or animal blood. These items included the fork and the stain from the floor of the hallway. Still other items analyzed produced results that were inconclusive or showed "no activity." Some items were not tested, including appellant's pants.

Vernon Ginn, a police fingerprint examiner, compared prints taken from the murder scene and the wrecked Oldsmobile with known prints of appellant, Robert Guerrero, Alejandro Guerrero, Rodolfo Guerrero, and Jose Luis Moreno. The lifted prints did not match any of the known prints of appellant or the other suspects.

There was evidence from several sources that a struggle appeared to have taken place in appellant's house. The officers at the scene did not observe any bruises, cuts, or marks on appellant's person indicating that he had been in a fight or struggle. The Bexar County Jail medical records included a form with a denial of any recent cuts, sores, bruises, or scars. The form had been completed at the time of booking. Several days after his arrest, appellant, while in jail, surrendered to Detective Jimmy Cole the shirt he had been wearing the night of his arrest. When he took off his shirt, Detective Cole did not observe any marks or signs of combat on appellant's body.

On June 12, 1996, appellant was interviewed by Detective Cole after Cole had been alerted several days earlier by appellant's daughter that appellant wanted to talk to him. At the interview, the incarcerated appellant produced a two-page handwritten statement out of his sock. The statement introduced by the State in evidence read:

"I apologize for lying to you. Det. Cole Saturday, 4, 1994, 10 or 11:00 A.M.

I woke up as I heard Lewis Guerrero talking to Rudy Guerrero. I went to the bath room wash up and then I joined Lewis, Rudy and Lewis M. Then Nanomi woke up. She told me that she was going to wash clothes that day at her sister's house. I then help her gather the clothes that needed washing. When, Nanomi, walked into the living room all of us men went outside. Then, Rudy sent out for beer. Nanomi, did not want me to drink beer that early so she went to cook and gave me some coke to drink.

At about 2 or 3 P.M. Nanomi's sister came for her.

Then about 4 P.M. Lewis Guerero went home. Rudy Guerero, Lewis M. and my-

self stayed outside. At about 6:30 P.M. give or take a few minutes on either side I walked to Ruben's Ice house for some beer. I met a friend (Boy, he cuts yards in the courts) and I did drink some beer with him there. I then bought a beer and started walking home. This was about 8:00 P.M. give or take a few minutes on either side. As I returned I noticed that the front door was close and the radio very loud. As I opened the door I saw blood, blood, blood ever where. I saw Beto Guerero, Rudy Guerero and Lewis M. cleaning up. I also saw the poor blooded victim there in the kitchen floor severely stabbed. I said, 'dam vatos what the hell did you do? Beto, answered and said that he had met the guy at the east side wanting to buy some coke and that he had money. Beto, said look at all the gold he is wearing do you want some gold? I said, no. I saw the victim's wounds were serious and I reached down to try to help him by sitting him up. But, a lot of blood came out from the back of his head. Then, Beto, said if Nanomi comes home now we will have to kill her also. I then said, 'I'll be back. Then Beto told me if you call the police and they arrest us, my brother will kill your family. I said no Beto. I am just going to make sure that Nanomi not come home and see you. So I walked around the corner to wait for Nanomi. At about 9:30 or 10:00 P.M. I saw Nanomi coming home. Before Nanomi went inside the house I stopped her. I then walked inside and saw that no one was there. The place was clean. I then told Nanomi what happened and that she was in danger for her to go somewhere else. Nanomi pick up some clothes to go somewhere else. I during this time threw out the trash that had some of the evidence. I made sure that Nanomi was out of the courts safely. At about 10:15–10:45 or so I walked the Pick Nick to buy some cig. As I walked back home I was stop by Beto in a new car he was driving. He told me if I wanted to go for a drive. I said, no. Beto was wearing all the gold rings and chains. Jose Lewis M, was with Beto in the car also. There was a witness who saw me talking to Beto. The witness name is

Mitchell a neighbor who lives there in Chihuahua street. I asked Beto about the body and he told me that they put the body in the back yard. But not to worry for they were going to put the body in the car later.

Eugenio Pesina, Jr.

P.S.

Det. Cole, the reason I said what I told you before was because I feared my family being killed. But, I have realize that this killers have to be stop from killing again."

Ruben Vera, Jr., appellant's neighbor, lived across the street at 704 Chihuahua, next to the dumpster. He testified that appellant lived with a woman named Naomi whose last name he did not know. He stated that appellant had no car as his wife had taken it when she left appellant. Vera stated that the Guerrero brothers, who lived in "the courts," were at appellant's house at all hours of the day and night. The brothers were always "picking" fights with the neighbors, drinking all night and "rebel rousing," and had thrown rocks and beer bottles at the Vera house. Vera recalled remonstrating with appellant about the activities of the Guerrero brothers and the safety of the neighbors.

About 9:30 or 10:00 a.m. on June 4, 1994, Vera saw appellant for the first time that day. There was a black T–Bird automobile with tinted windows parked in front of appellant's house, a vehicle that Vera had never seen before. The car was not a 1986 Oldsmobile Delta 88 "not even close." There were "a lot" of people at appellant's house, but Vera observed that they were the "usual" people with whom appellant associated including most of the Guerrero brothers. About 3:00 p.m., Vera saw appellant holding his head as if "in anguish." At 4:00 p.m., Vera saw appellant going through the glove compartment of the T–Bird automobile. Near sunset, Vera observed that the T–Bird automobile was gone. About 6:30 p.m., Vera saw appellant leave his house on foot. That night after 11:00 p.m., Vera heard some banging noise and saw appellant emptying a trash can into the dumpster. Still later, he saw appellant walking to a public telephone. When the police arrived, Vera informed them

of his observations. Vera acknowledged that he ran some errands during the day and had not been home at all times. He was unable to place the victim in appellant's house or in appellant's company. Vera expressed the opinion that appellant and his friends were acting paranoid that day and were not their "usual selves." They avoided looking at him.

Calista Galvan, age nineteen, testified that she lived near appellant. On June 4, 1994, she slept most of the day and had awakened about 8:30 in the evening. She had stayed out late the previous night. She and a friend, Sally Trevino, decided to walk to appellant's house to get a cigarette. It was "getting dark by this time." At the dumpster Galvan picked up a small black dog that she thought was a Pekingese. Appellant was outside his house and appeared nervous, was mumbling, and did not act as he normally behaved. He told Galvan and her friend to go home. In response to Galvan's inquiry, appellant stated that he did not know where the Guerrero brothers were. Galvan related that most of the time the Guerrero brothers were at appellant's house. She testified that she had lived with Abel Guerrero for about two months.

Ignoring appellant's earlier request, Galvan and Trevino entered the house without an invitation. They found Naomi washing something in the sink and Galvan observed a wallet on the counter. After talking to Naomi, Galvan left the house. As she did, appellant told her "to look in the back," and mumbled something about a guy with a gun and "why didn't he just leave?" Appellant added that the guy was told not to mess with the Guerreros and further stated: "Why did he fuck with us? I told him not to fuck with us." Galvan and Trevino looked into the backyard and saw a body. A friend, Letty, and her male cousin came by. The cousin went into the backyard and stated that the man was dead.

Galvan, still in search of a cigarette, returned to appellant, who was still outside the house. Appellant offered Galvan the dark colored car parked in front of the house, a small car, "like a Pontiac," not a "little little"

car, but a "little Pontiac." Galvan knew that the Guerrero brothers drove a four-door yellow car. Shortly thereafter, "Beto and Louis" appeared and asked for the keys to the parked car. Appellant did not know where the keys were but they were later found. Galvan took the black dog and returned home. Naomi later came to Galvan's house asking for Clorox, but was not given any cleaner. Still later, Galvan saw appellant getting out of a car driven by someone else. He appeared nervous and was pacing back and forth. Appellant asked Galvan to tell the police he had been at Ruben's Ice House and she refused.[4] The police arrived several minutes later.

Appellant's mother testified that he had polio when he was six years old, and that the forty-one year old appellant had a relapse in 1990 and walked with a cane.

### DID APPELLANT ACT ALONE?

With this background, we examine the evidence to determine if the evidence is legally sufficient to establish beyond a reasonable doubt that appellant was "acting alone" or as a primary actor in the murder alleged. The State was required to prove that appellant intentionally or knowingly caused the death of the alleged victim by stabbing the victim with a fork, a deadly weapon. The specific allegations in the indictment became "facts required to establish the charged offense." *Wray v. State*, 711 S.W.2d 631, 633 (Tex.Crim.App.1986); *Windham v. State*, 638 S.W.2d 486, 487–88 (Tex. Crim.App.1982).

No eye witnesses to the offense testified. There was no direct evidence supporting the allegations that appellant intentionally or knowingly and acting alone or as a primary actor stabbed the victim with a fork. No showing was made of any prior relationship between appellant and the victim and there was certainly no direct evidence which placed appellant in the company of the victim until after the infliction of the fatal wound. Suspicions abound, but neither the direct nor circumstantial evidence is sufficient to sup-

---

**4.** Galvan admitted that she had not included appellant's request in the statement she had given the police shortly after the offense, but recalled it at the time of trial.

port appellant's conviction as a primary actor or as "acting alone." It is appropriate, where alternative theories of committing the same offense are submitted to the jury in the disjunctive, for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted. *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex.Crim.App.1991), *cert. denied*, 504 U.S. 958, 112 S.Ct. 2309, 119 L.Ed.2d 230 (1992). The jury in the instant case returned a general verdict. That verdict cannot be upheld on the theory discussed above although submitted.

### *PARTIES*

The State's theory from voir dire examination to its opening statement to its final argument was that appellant's guilt depended upon the law of parties. The State urges now that the general verdict of the jury supports appellant's conviction as a party to the murder.

A person is criminally responsible as a party to an offense if the offense is committed by .... the conduct of another for which he is criminally responsible....

TEX. PENAL CODE ANN. § 7.01(a) (Vernon 1944).[5]

The Penal Code further provides:

(a) A person is criminally responsible for an offense committed by the conduct of another if:

　　　*　　*　　*　　*　　*　　*

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 1994).[6]

■■■■ Before undertaking a determination of the legal sufficiency of the evidence to support appellant's conviction as a party, we must examine the law of parties. When an accused promotes or assists in the commis-

sion of an offense, he also shares the criminal responsibility. *Haddad*, 860 S.W.2d at 950. If the State is to prove the accused's guilt as a party, it must first prove the guilt of another person as the primary actor. *Richardson v. State*, 879 S.W.2d 874, 882 (Tex.Crim.App. 1993), *cert. denied*, 513 U.S. 1085, 115 S.Ct. 741, 130 L.Ed.2d 643 (1995); *Forbes v. State*, 513 S.W.2d 72, 79 (Tex.Crim.App.1974), *cert. denied*, 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975); *Godwin v. State*, 899 S.W.2d 387, 389 (Tex.App.—Houston [14th Dist.] 1995, pet. ref'd). If the evidence is insufficient to convict the named or unnamed co-defendant as a primary actor, it follows that the trial court has authorized a conviction of the defendant as a party on a theory unsupported by the evidence. *Richardson*, 879 S.W.2d at 822. In order to establish liability as a party in addition to the illegal conduct by the primary actor, it must be shown that the accused harbored the specific intent to promote or assist the commission of the offense, i.e., intentional murder. *Lawton v. State*, 913 S.W.2d 542, 555 (Tex.Crim.App. 1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996); *Tucker v. State*, 771 S.W.2d 523, 530 (Tex.Crim.App.1988), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989); *Garcia v. State*, 871 S.W.2d 279, 281 (Tex.App.—El Paso 1994, no pet.) (holding evidence must show conduct constituting offense plus an act or acts by accused done with the intent to promote or assist such conduct). The accused must know that he was assisting in the offense's commission. *Amaya v. State*, 733 S.W.2d 168, 174–75 (Tex.Crim.App.1986); *Price v. State*, 911 S.W.2d 129, 131 (Tex.App.—Corpus Christi 1995, pet. ref'd). The agreement, if any, *must be before or contemporaneous* with the criminal event. *Miranda v. State*, 813 S.W.2d 724, 732 (Tex.App.—San Antonio 1991, pet. ref'd) (emphasis added); *see Beier v. State*, 687 S.W.2d 2, 3–4 (Tex.Crim.App. 1985). The evidence must show that *at the time of the commission of the offense*, the parties were acting together, each doing

---

**5.** The current code is cited for convenience. There was no apparent change from the law applicable to the instant offense. *See* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 894 (amended 1993) (current

version TEX. PENAL CODE ANN. § 7.01(a) (Vernon 1994)).

**6.** *See* note 5 above.

some part of the execution of the common design. *Brooks v. State*, 580 S.W.2d 825, 831 (Tex.Crim.App.1979) (emphasis added); *Thomas v. State*, 915 S.W.2d 597, 599–600 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd); *Cornejo v. State*, 871 S.W.2d 752, 755–56 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd). The essential principle of parties' culpability is the common design to do a criminal act. *Brooks*, 580 S.W.2d at 831.

▮▮▮▮ While an agreement of the parties to act together in common design seldom can be proved by direct evidence, reliance may be had on the actions of the parties, showing by either direct or circumstantial evidence, an understanding and common design to do a certain act. *Burdine v. State*, 719 S.W.2d 309, 315 (Tex.Crim.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Ex parte Prior*, 540 S.W.2d 723, 727–28 (Tex.Crim.App.1976); *Bratcher v. State*, 771 S.W.2d 175, 183 (Tex. App.—San Antonio 1989, no pet.). Circumstantial evidence alone may be sufficient to show that one is a party to the offense. *Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim.App.1977); *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex.Crim.App.1987).

▮▮▮ The State must show more than mere presence to establish participation in a criminal offense. *Valdez v. State*, 623 S.W.2d 317, 321 (Tex.Crim.App.1981). Mere presence or even knowledge of an offense do not make one a party to the offense. *Oaks v. State*, 642 S.W.2d 174, 177 (Tex.Crim.App. 1982); *Acy v. State*, 618 S.W.2d 362, 365 (Tex.Crim.App.1981); *see Monroe v. State*, 47 Tex.Crim. 59, 81 S.W. 726, 727 (App.1904) (holding mere fact defendant who was present but did not participate or aid in homicide, concealed the offense for a time or failed to report killing, did not make him guilty of any offense).

▮▮▮ One's acts committed after the offense is completed cannot make him a party to the offense. *Morrison v. State*, 608 S.W.2d 233, 235 (Tex.Crim.App.1980); *Guillory v. State*, 877 S.W.2d 71, 74 (Tex.App.— Houston [1st Dist.] 1994, pet. ref'd). Standing alone, proof that an accused assisted the primary actor after the commission of the offense is insufficient, although the accused's conduct may constitute the independent offense of hindering apprehension or prosecution.[7] *See Urtado v. State*, 605 S.W.2d 907, 912 (Tex.Crim.App.1980). The 1925 Penal Code provision (article 77) that an accessory after the fact was a party to the crime has been repealed. *Urtado*, 605 S.W.2d at 912; *see also Wygal*, 555 S.W.2d at 470; *Easter v. State*, 536 S.W.2d 223, 228–29 (Tex.Crim.App. 1976); 42 George E. Dix and Robert O. Dawson, *Criminal Practice and Procedure*, § 31.163 at 252 (Texas Practice 1995).

▮▮▮▮ While the "indictment is directed to the defendant for notice and jurisdiction requirements," it "is the charge that convicts." *Fisher*, 887 S.W.2d at 53 (quoting *Benson v. State*, 661 S.W.2d 708, 715 (Tex. Crim.App.1982), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984)). The function of the jury charge is to instruct the jury on applying the law to the facts. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex.Crim. App.1994). The "law" applicable to a specific case is the law which is contained within the jury charge. *Cunningham v. State*, 848 S.W.2d 898, 905 (Tex.App.—Corpus Christi 1993, pet. ref'd). The State must prove what the charge requires the jury to find in order to convict. *See Fee v. State*, 841 S.W.2d 392, 396 (Tex.Crim.App.1992). There is no such thing as "surplusage" in the application or authorization paragraph of the jury charge. *Id.*; *Ortega v. State*, 668 S.W.2d 701, 704–05 n. 10 (Tex.Crim.App.1983).

The trial court charged abstractly on the law of parties and then submitted to the jury the following application paragraph:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 4th day of June, A.D., 1994 in Bexar County, Texas, the defendant, Eugenio Pesina, Jr., either acting alone or together with another or others as a party, as that term has heretofore been defined in this charge, did intentionally or knowingly cause the death of an individual, Keith Eugene Barabe, by stabbing the said Keith Eugene Barabe with a deadly weapon,

---

7. *See* Tex. Penal Code Ann. § 38.05 (Vernon 1994).

namely: a fork, that in the manner of its use or intended use was capable of causing death or serious bodily injury or that he acted with the intent to promote or assist in the commission of the offense, in that he aided or attempted to aid the other person or persons in the commission of the offense in that he caused the removal of the blood of the deceased from the defendant's residence, if you so find, or that he removed the personal belongings of the deceased from the defendant's residence, if you so find, or that he removed the body of the deceased from the defendant's residence, if you so find, then you will find the defendant guilty of murder as charged in the indictment.

Unless you find beyond a reasonable doubt, or if you find a reasonable doubt thereof, you will find the defendant not guilty.

We must determine whether the evidence supports the murder conviction based on the law of parties as authorized by the charge given. *See Arceneaux v. State*, 803 S.W.2d 267, 270–71 (Tex.Crim.App.1990). In the instant case, the trial court charged abstractly on the law of parties and submitted the application paragraph set out above. The court's charge limited the modes of conduct (solicits, encourages, directs, aids, or attempts to aid) set out in section 7.02(a)(2) of the Penal Code to the mode of "aided or attempted to aid." In this regard, the charge met the requirements of *Johnson v. State*, 739 S.W.2d 299, 305 n. 4 (Tex.Crim. App.1987) [8] that only the mode or modes of conduct finding support in the evidence be submitted to the jury. The charge, however, went farther. It authorized conviction as a party if the jury found beyond a reasonable doubt that appellant "aided or attempted to aid" *in the commission of the offense* by committing any one of the three acts of removal described in the charge. Thus, the jury charge contained an evidentiary basis for the specific conduct of "aided or attempt-

ed to aid." [9] The acts, if they did occur, occurred after the commission of the offense. One's acts committed after the offense is completed cannot make him a party to the offense. *Guillory*, 877 S.W.2d at 74.

■ In order to convict appellant as a party to the murder of the alleged victim under the jury instructions given, the jury was required to find beyond a reasonable doubt that an unnamed person or persons did intentionally or knowingly cause the death of the victim by stabbing him with a fork, a deadly weapon, and that in addition appellant (aware that he was assisting in the commission of the offense) acted with the specific intent to promote and assist in the commission of the offense and "aided or attempted to aid" another or other unnamed individuals by removing the deceased's (1) blood, or (2) personal belongings, or (3) body from the residence in question.

The State did not object to the charge as submitted. In fact, it expressly requested the inclusion of the removal of the blood issue in the charge. The State thus accepted the burden of proving its case as set forth in the court's charge. *Boozer*, 717 S.W.2d at 611; *see also Fee*, 841 S.W.2d at 396. The trial court's charge was clearly in error in authorizing appellant's conviction as a party for acts done after the completion of the offense.[10] Even if it could be argued that the evidence supported each issue the jury was required to find in order to constitute appellant a party, that verdict cannot stand because such finding would not constitute appellant a party to the offense.

We are aware of the holding in *Emmett v. State*, 654 S.W.2d 48 (Tex.App.—Dallas 1983, no pet.). There, the issue was whether a charge on accomplice witness should have been given. After reviewing some rather general principles relating to the law of parties, the court wrote:

contain the evidentiary basis for the specific conduct which supports the submission of the issue.

---

8. *See also Ransom v. State*, 920 S.W.2d 288, 303 (Tex.Crim.App.1994), *cert. denied*, —— U.S. ——, 117 S.Ct. 587, 136 L.Ed.2d 516 (1996).

9. In *Cunningham*, 848 S.W.2d at 906, the court found no reason to require the jury charge to

10. Appellant timely objected to the court's charge on this basis and the error is the subject matter of appellant's seventh point of error.

Our examination of these legal principles leads us to conclude that although an accessory after the fact may not be charged as a party to the principal offense, a person who has previously agreed to act as an accessory after the fact does thereby render himself liable as a party to the offense. *Id.* at 50.

The *Emmett* court did not add to its reasoning or cite any authority to support its conclusion. Its language is confusing. Despite a somewhat tentative recognition that the classification of an accessory after the fact as a party has been eliminated from the Penal Code, the court seemed to say a person may still agree to act as an accessory after the fact without hinting as to what acts would now constitute one an accessory after the fact when that classification no longer exists.[11] We are not bound by *Emmett* and decline to follow it. Moreover, if it could be argued that *Emmett* is applicable, there is no evidence, direct or circumstantial, showing that prior to or contemporaneous with the commission of the offense by another or others appellant agreed to do any of the acts enumerated after the fact.

Still further, if we were permitted to disregard as surplusage the evidentiary basis for the law of parties as set forth in the court's charge, there still would be a serious question as to the sufficiency of the evidence to show appellant's guilt as a party.

This was a heinous crime involving a tragic loss of life regardless of whether narcotics played a role in the event. Appellant was established as a liar and clearly was not above suspicion. This Court is, however, bound by the record and the applicable law. We conclude that in measuring the evidence by the indictment as incorporated in the court's charge, no rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged so as to establish appellant's guilt as a primary actor or as a party to the offense. We sustain appellant's contention as to the legal sufficiency of the evidence to support the conviction. The conviction cannot stand.

11. The *Emmett* court did not make reference to the former statutory provision, the common law,

In view of our disposition of the foregoing contention, we need not reach the other points of error. The judgment of conviction is reversed and appellant is ordered acquitted. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

or give its own definition.