header.ag1








NUMBER 13-97-893-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI


__________________________________________________________________


JOHNNY GONZALES, Appellant,



v.




THE STATE OF TEXAS, Appellee.

___________________________________________________________________



On appeal from the 117th District Court

of Nueces County, Texas.


___________________________________________________________________



O P I N I O N




Before Chief Justice Seerden, Justices Yañez and Chavez

Opinion by Justice Chavez



 Appellant Johnny Gonzales was convicted by a jury of capital murder, (1) burglary of a habitation, (2) and two counts of
aggravated assault. (3) He was sentenced to confinement in the Texas Department of Criminal Justice--Institutional Division
for life for capital murder, forty years for burglary, and sixty and eighty years for each of the aggravated assaults. By one
point of error, appellant challenges the legal and factual sufficiency of the evidence to support his convictions. We affirm.

 John Baltazar and appellant were roommates. On a Saturday evening around 9:00 p.m., Baltazar approached appellant and
his girlfriend, Beatriz Evans, as they sat in Evans's car. Baltazar explained that his mother's ex-boyfriend, Ted Cuellar, had
hit her with a bat. He told appellant he "was going to take care of it." He asked appellant to go with him to confront
Cuellar and appellant agreed. 

 Appellant and Evans followed Baltazar and appellant's fourteen-year old nephew to a convenience store to purchase gas. 
From there, appellant continued to follow Baltazar as they made three more stops at different locations. At some point,
Baltazar picked up his girlfriend, Linda Clark, who rode in the car with him, and appellant's nephew became a passenger in
the car appellant was driving.



 They drove to the home of Jose Marines and Matilda Cuellar. (4) Ted Cuellar was Matilda's brother and was known to stay
with the Marines family from time to time. When he did, he slept on a couch in the living room; a fact known to Baltazar.
Baltazar and appellant went to the Marines' front door and Baltazar kicked it open, damaging the door and lock. Appellant
followed Baltazar into the living room, where the latter aimed a gun at the couch and fired three shots. Two of the shots
fatally wounded the Marines' five-year old daughter, Adriana, and the third critically injured her ten-year old cousin,
Vanessa, as they watched television. Apparently realizing that Cuellar was not on the couch, Baltazar and appellant walked
further into the living room, down a hallway, and toward the bedrooms. Jose and Matilda were in their bedroom when they
heard the noise. When Matilda opened the bedroom door, she saw a man standing there with a gun and another man
standing right next to him. As Jose was getting off the bed, Baltazar shot him in the mouth and again in the neck. Jose's
and Vanessa's injuries were serious, but both lived.

 During this time, Evans waited outside in the car with appellant's nephew and claims to have been asleep by the time they
arrived at the Marines' home. She said she was awoken by the sound of gunshots and the screams of appellant's nephew,
who was kicking the front seat. When she woke up, she saw Baltazar and appellant running from the house towards the
cars. Both men got in the cars and fled the scene.

 While police personnel questioned family members at the scene, Cuellar arrived and provided police with information
leading them to Baltazar's location where he was arrested. The following day, Corpus Christi Police Sergeant Ray Rivera
questioned appellant about his knowledge of the incident. Appellant denied any involvement and told Rivera that he had
been passed out drunk at home the entire night before. One week later, after appellant was indicted and a warrant issued
for his arrest, he agreed to turn himself in. He was arrested and taken to the police station where he made a written
statement regarding his involvement in the incident.

 At trial, appellant pleaded "not guilty" to each offense, but a jury convicted him under the law of parties and the law of
transferred intent for (1) the capital murder of Adriana Marines, (2) burglary of a habitation, and (3) aggravated assault
against Jose Marines and Vanessa Marines.

 By one point of error, appellant complains that the evidence in the case was "totally insufficient" to support his
convictions. Specifically, he contends the evidence was insufficient to establish his role as a party to each of the offenses. 
Appellant does not clarify whether he challenges the legal or factual sufficiency of the evidence supporting his involvement
as a party. However, his brief concludes with a request that we reverse and acquit, or alternatively grant a new trial. In the
interest of justice, we evaluate the evidence under both standards. In reviewing the legal sufficiency of the evidence
adduced at trial, we examine all of the evidence in the light most favorable to the prosecution in order to determine whether
any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 319 (1979); Clewis v. State, 922 S.W.2d 126, 132 (Tex. Crim. App. 1996). This standard of review
applies to both direct and circumstantial evidence cases. Green v. State, 840 S.W.2d 394, 401 (Tex. Crim. App. 1992).

 In reviewing the factual sufficiency of the evidence, we view all the evidence without the prism of "in the light most
favorable to the prosecution" and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence
as to be clearly wrong and unjust. Clewis, 922 S.W.2d at 129; Lemons v. State, 953 S.W.2d 825, 827 (Tex. App.--Corpus
Christi 1997, no pet.). This standard has been extended to capital cases. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim.
App. 1996); Bath v. State 951 S.W.2d 11, 14-15 (Tex. App.--Corpus Christi 1997, pet. ref'd). Moreover, in performing a
factual sufficiency review, we are required to give deference to the jury verdict and examine all evidence impartially. Cain
v. State, 958 S.W.2d 404, 410 (Tex. Crim. App. 1997).



 Applicable to all four counts, the jury charge instructed on the law of parties and transferred intent. See Tex. Penal Code
Ann. §§ 6.04, 7.01, 7.02 (Vernon 1994). The application paragraph in count three of the charge, relating to aggravated
assault, provided in part:

 Now, if you find from the evidence beyond a reasonable doubt that on or about the 27th day of September, 1997, in Nueces
County, Texas, JOHN BALTAZAR did intentionally or knowingly or recklessly cause bodily injury to Vanessa Marines by
shooting Vanessa Marines with a firearm, AND that JOHNNY GONZALES, did then and there acting to promote the
commission of the offense, did solicit, encourage, aid or attempt to aid JOHN BALTAZAR in the commission of said
offense, then you will find the Defendant, JOHNNY GONZALES, guilty of the offense of aggravated assault as alleged in
Count IV [sic] of the indictment.



 This language tracks sections 22.01 and 22.02 of the penal code. Under section 22.01(a)(1), a person commits assault if he
"intentionally, knowingly, or recklessly causes bodily injury to another." Tex. Penal Code Ann. § 22.01(a)(1) (Vernon
1994). Under section 22.02, a person commits aggravated assault if the person commits assault as defined in section 22.01
and the person "uses or exhibits a deadly weapon during the commission of the assault." Id. at § 22.02(a)(2).

 Applying the law of transferred intent for a different offense, count three of the jury charge also provided:

 Now bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about
the 27th day of September, 1997, in Nueces County, Texas, that the only difference between what actually occurred
(aggravated assault), if it occurred and what the Defendant desired, contemplated or risked (assault) was that a different
offense (aggravated assault) was committed, in that it was a foreseeable ordinary and probable consequence of the
preparation or execution of the unlawful act, then you will find the Defendant JOHNNY GONZALES, guilty of Aggravated
Assault. (5)



The aggravated assault charge in count four was identical, except it replaced the name of the victim, "Vanessa Marines,"
with "Jose Arturo Marines."

 Because it is undisputed that appellant was not the actual shooter, the issue before us is whether appellant was a party to
the assault. Evidence is sufficient to convict under the law of parties if the defendant is physically present at the
commission of the offense and encourages its commission by words or other agreement. Ransom v. State, 920 S.W.2d 288,
302 (Tex. Crim. App. 1994); Cordova v. State, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). In determining whether an
individual is a party to an offense and bears criminal responsibility, the court may look to events before, during, and after
the commission of the offense. Beardsley v. State, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987); Rosillo v. State, 953
S.W.2d 808, 814 (Tex. App.--Corpus Christi 1997, no pet.). Circumstantial evidence may be sufficient to show that one is
a party to the offense. Beardsley, 738 S.W.2d at 684. While an agreement of the parties to act together in common design
seldom can be proved by direct evidence, reliance may be had on the actions of the parties, showing by either direct or
circumstantial evidence, an understanding and common design to do a certain act. Pesina v. State, 949 S.W.2d 374, 383
(Tex. App.--San Antonio 1997, no pet.) (citing Burdine v. State, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986). Mere
presence at the scene of the offense is insufficient evidence of intentional participation in the offense. Acy v. State, 618
S.W.2d 362, 365 (Tex. Crim. App. 1981); Segura v. State, 850 S.W.2d 681 (Tex. App.--Corpus Christi 1993, no pet.).

 Viewed in the light most favorable to the prosecution, the State's evidence showing appellant's party status came from
several sources, including appellant's written statement made to police: (6)

 My name is Johnny Gonzales and I am 26 years old. I live at 4614 Vestal. Today, 10-3-97 I was interviewed by Sgt. Ray
Rivera and Richard Garcia. This past Saturday, I came back from the store. I went to buy beer for John Baltazar. John
lives with me and is on parole. He has to be in by 9 at night. When I got back from the beer store to my house, John was
mad. John told me that his mom got hit by her ex-dude with a bat. He said he was going to take care of it. I told him to
confront the dude and confirm it before he did anything stupid. John left in [a] brown car that Linda Clark owns. He came
back 15 or 20 minutes later. John said to me are you going to go with me, come along, I might need some back up. Linda
Clark had come over to my house, before John left in Linda's car. Me, Ramsey and Beatrice followed them [John and
Linda] in Beatrice's green Ford Tauras [sic]. I followed John to a house. He stopped in front of a house and parked. He
jogged to the front of the front door and I followed him. John stopped, and then kicked the front door down. He took two
steps, raised his right hand and shot at the couch. I heard a little girl scream. I grabbed John with one hand on the shoulder
and he pulled away. We were in the living room, and he went towards the bedroom and shot. I turned to go out the front
door and went out. John came running out and said let's go, let's go. Later that same night, John was depressed because he
shot a little girl. John said, that dude always sleeps on the couch, I wanted to get him. I didn't have a gun and I don't know
where the gun is. This statement is true and correct to the best of my knowledge.



 In another statement provided to police, Evans said she overheard Baltazar tell appellant, "I need esquina. You want to
come with me or not?" and appellant replied, "Okay." According to Evans, "esquina" is a term meaning "backup." 
Appellant told her that Baltazar was going "to go kick the guy's ass." After appellant agreed to accompany Baltazar, Evans
testified that she and appellant followed Baltazar to a convenience store for gas, then to another location where Baltazar
met his brother and another man. After waiting in the car approximately twenty to twenty-five minutes, Baltazar instructed
appellant and Evans to keep following him. They continued to do so until arriving at Linda Clark's house, where Baltazar
spent another fifteen to twenty minutes. From there, they followed Baltazar to Karen Street, where Evans believed
Baltazar's brother lived. Baltazar walked towards the house, but Evans was not sure whether he went inside. After leaving
this location, Evans said she fell asleep and remembers waking up to gunshots and seeing both appellant and Baltazar
running back towards the cars.

 The ten-year old victim in this case, Vanessa, testified that she and Adriana were lying on the couch watching videos in the
living room of the Marines' home when she saw two men kick down the door. One of the men had a gun holding it
"straight out," and the second man was "pretty close" to the first. The man with the gun was not wearing a shirt, but was
just wearing blue jeans. She saw the men inside the living room by the front door and remembered hearing only one shot
before closing her eyes. When she opened her eyes again, the men had already left.

 Matilda Cuellar testified that she and her husband were in their bedroom when they heard a "loud bang." When she
opened her bedroom door, she "saw a guy standing there with a gun, and there was another gentleman standing beside
him." She said the man with the gun was not wearing a shirt and the other was wearing a white t-shirt. Both men were right
in front of her door when one fired two shots at Jose. She said there was a slight pause between the two shots, and during
this pause neither of the men moved, they just stood there. She saw Jose get shot the second time, and then as she began to
close and lock the door, both men turned and left.

 We find this evidence legally sufficient to show appellant acted as a party. According to Evans, appellant knew that
Baltazar's intent was to go "kick the guy's ass." Her testimony indicates that appellant specifically agreed to act as
"esquina" or "back up" for Baltazar when requested to do so. The jury could have reasonably concluded that direct
evidence of such an agreement, coupled with appellant's willingness to continuously follow Baltazar to several locations
before finally arriving at the Marines' house, indicated his desire to promote or assist the commission of an assault. The
jury could have further concluded that appellant's actions amounted to more than mere presence and that he, at all times,
was there to aid or encourage the commission of the assault as he willingly (1) stood by and watched Baltazar forcefully
enter the home by kicking the door open; (2) entered the living room and watched Baltazar shoot Adriana and Vanessa; (3)
followed Baltazar towards one of the bedrooms in the house and watched him shoot Jose Marines; and (4) ran out of the
house with Baltazar as they fled the scene. 

 Reviewing all the evidence, and not merely the evidence favorable to the prosecution, appellant urges us to consider parts
of his statement to show he was not acting as a party: "I told him [Baltazar] to confront the dude and confirm it before he
did anything stupid." But even if appellant did in fact suggest a meeting to "confront and confirm," it is evident from his
actions that neither he nor Baltazar decided to follow this course of action. As the State argued at trial, one does not kick in
the door to a residence if only to confirm some information. After the door was kicked open, appellant voluntarily entered
the living room and stood by as Baltazar fired three shots toward the couch. This evidence suggests appellant was no
longer merely present at the scene, but instead, was truly acting as Baltazar's backup.

 Appellant contends his statement shows that once he became aware of the gun, he grabbed the arm of the shooter trying
unsuccessfully to stop him. However, this is not what was said. The statement explains that after Baltazar shot at the
couch, appellant "grabbed John with one hand on the shoulder and he pulled away." Grabbing one's shoulder after the
person has already fired a gun fails to establish that appellant was trying to stop him. Nevertheless, even if he was trying to
stop Baltazar, the impact of this statement is contradicted by Matilda's testimony stating that both men were standing in
front of her bedroom door. A floor plan of the home, admitted into evidence, shows that a person would need to take
several steps into the living room and down a hallway before arriving at the bedroom door. Voluntarily following Baltazar
into the living room, down the hallway, and towards the rear bedroom of the house discredits appellant's theory that he tried
to stop Baltazar. It was within the jury's province to resolve evidentiary conflicts and choose which evidence to believe.
See Tex. Code Crim. Proc. Ann. § 38.04 (Vernon 1979).

 Appellant insists the lack of evidence to show he had knowledge a gun would be used precludes a finding of aggravated
assault, because without this knowledge, appellant could not have known that serious bodily injury would result. However,
if the jury chose to believe Matilda's testimony that both men were present in front of her bedroom door, it is apparent that
appellant had already witnessed several shots fired in the living room and knew that Baltazar was using a gun. Based on
this evidence, the jury could have reasonably concluded that appellant was aware of Baltazar's possession of the gun before
the first shots were ever fired. Thus, under the law of transferred intent, even if appellant agreed only to participate in an
assault, the aggravated assault was a "foreseeable, ordinary, and probable consequence" of the assault.

 Based on our review of all the evidence in this case, we find the evidence both legally and factually sufficient to support
both of appellant's convictions for aggravated assault. We affirm the trial court's judgment with respect to both counts.

 In reference to the conviction for burglary, the jury charge provided:

 Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that on or
about the 27th day of September, 1997 in Nueces County, Texas, JOHN BALTAZAR, did then and there intentionally or
knowingly enter a habitation owned by Jose Arturo Marines without the effective consent of Jose Arturo Marines, with the
intent to commit aggravated assault; AND that JOHNNY GONZALES, did then and there acting to promote the
commission of the offense, did solicit, encourage, aid or attempt to aid JOHN BALTAZAR in the commission of said
offense, then you will find the Defendant, JOHNNY GONZALES guilty of the offense of Burglary of a Habitation.

This charge tracks the statutory language for burglary of a habitation found in section 30.02 of the penal code which
provides that a person commits burglary if without the effective consent of the owner, he enters a habitation with intent to
commit a felony or theft. Tex. Penal Code Ann. § 30.02(a)(1) (Vernon 1994). At trial, Jose Marines testified that he never
gave appellant consent to enter his home on the night in question or anytime previous. It is also undisputed that appellant
entered the Marines' home. This evidence, taken with our disposition on the aggravated assault offenses, is legally and
factually sufficient to support the burglary conviction. We affirm the conviction.

 Capital murder can be committed if a person intentionally commits murder in the course of committing or attempting to
commit burglary, or if the person murders an individual under six years of age. Tex. Penal Code Ann. § 19.03(a)(2) & (8)
(Vernon 1994). Here, the jury was authorized to make a finding of guilt under both theories. We have already recited the
relevant evidence. Adriana Marines was only five years old when she was murdered. Baltazar intentionally shot and killed
Adriana with the belief that Cuellar would be on the couch. The murder occurred while appellant, as a party, was in the
course of committing or attempting to commit burglary of a habitation. The evidence is both legally and factually sufficient
to show appellant was a party to the capital murder offense.

 Accordingly, we overrule appellant's sole point of error and AFFIRM the trial court's judgment.



 MELCHOR CHAVEZ


Justice



Do not publish.

Tex. R. App. P. 47.3.



Opinion delivered and filed this

the 27th day of May, 1999.

1. Tex. Penal Code Ann. § 19.03(a)(2) & (8) (Vernon 1994).

2. Tex. Penal Code Ann. § 30.02(a)(1) (Vernon 1994).

3. Tex. Penal Code Ann. § 22.02(a)(1) & (2) (Vernon 1994).

4. Jose and Matilda are married. Subsequent references to their family or household will be stated as the "Marines."

5. This language tracks section 6.04, subsection (b) of the penal code which provides:



 (b) A person is nevertheless criminally responsible for causing a result if the only difference between what actually
occurred and what he desired, contemplated, or risked is that:

 (1) a different offense was committed; or 

 (2) a different person or property was injured, harmed, or otherwise affected.



Tex. Penal Code Ann. § 6.04(b) (Vernon 1994).

6. The statement was admitted into evidence, but appellant never testified at trial.