NO. 12-01-00118-CR



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


JOHN GLENN BROWN,
§
 APPEAL FROM THE 337TH

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 HARRIS COUNTY, TEXAS

 

 A jury convicted Appellant John Glenn Brown of murder and sentenced him to thirty-five
years in prison. Appellant raises four issues on appeal. We affirm.


Background 

 In the early evening hours of August 15, 1999, Tony Gaston ("Tony"), who had graduated
from high school the previous May and was set to begin college at the University of Houston the
following week, went to meet someone who was selling a used car he was interested in buying. 
Tony was driving his father's dark blue Chevy pickup truck, and Tony's younger brother Justin
Gaston ("Justin") was along for the ride. Upon meeting with the seller of the used car in a parking
lot in Northshore in eastern Harris County, Tony decided to buy the vehicle and left to return home
to get a check for the purchase. After Tony pulled out of the parking lot, he made a U-turn on
Woodforest Boulevard and cut off another automobile.

 The car stayed behind the truck for a short distance and then came around the truck on its
right side and got in front of it. The two vehicles continued to travel down Woodforest with the
truck directly behind the car for several minutes. During this time, Justin observed that the car was
a Mazda Protege and that there was a sticker on the bumper which read, "My child is an honor
student at Field Elementary." Justin could see the driver of the Protege looking in his rearview
mirror, waving his fingers and hands. 

 Soon the Protege moved into the lefthand lane. Tony continued in the same lane, and the
Protege fell back so that it was driving beside the truck. Three or four miles (1) from the place where
Tony had pulled out in front of the Protege, the two vehicles stopped side by side at a red light, with
the car on the left side of the truck. According to Justin, Tony looked at the two occupants of the
Protege, but did not say anything to them or gesture to them in any way. Justin recounted that Tony
was not angry with the occupants of the Protege, but he told Justin the two guys were just being
"asses." 

 When the light turned green, the truck began to pull forward. Justin heard glass shatter and
assumed that someone had thrown a bottle at the truck. The truck continued forward a short distance
but left the roadway and, after running along an iron fence, crashed into the office building of an
apartment complex adjacent to Woodforest. The Protege sped away so hastily that Justin could
actually smell rubber burning as the tires spun against the pavement. 

 After the truck came to rest, Justin observed that Tony was bleeding profusely and was
unresponsive. Tony, who had been shot in the left side of his face, died early the next morning in
a Houston hospital. 

 That same morning, Justin met with a police sketch artist who composed a picture of the
passenger in the Protege from Justin's description. When the sketch and the description of the car
were released to the public, an acquaintance of Appellant's recognized the sketch as Appellant's
brother, John David Brown ("David"), and the car as Appellant's girlfriend's car. Based on that
individual's information, along with Justin's description of the two occupants of the Protege, the
police began an investigation of the Brown brothers. The brothers were subsequently charged with
Tony's murder. They were tried together, and both were convicted.

 

Sufficiency of the Evidence

 In his first issue, Appellant contends that the evidence is both legally and factually
insufficient to support his conviction. Appellant concedes that he was the driver of the vehicle from
which David shot and killed Tony. However, Appellant contends that the evidence is legally and
factually insufficient to support his conviction as a party to the offense of murder because there was
no evidence that Appellant intended that Tony be killed. 

 When evaluating the sufficiency of the evidence, an appellate court must look at all the
evidence, whether properly or improperly admitted. Dewberry v. State, 4 S.W.3d 735, 740 (Tex.
Crim. App. 1999); Johnson v. State, 967 S.W.2d 410, 412 (Tex. Crim. App. 1998). Because all
evidence which the trial judge has ruled admissible may be weighed and considered by the jury, a
reviewing court is obliged to assess the jury's factual findings from this perspective. Thomas v.
State, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988). Therefore, it is possible for an appellate court
to reverse a case on the basis of inadmissible evidence, but prior to reversal to find that the evidence,
including the inadmissible evidence, was sufficient to establish guilt. Alexander v. State, 866
S.W.2d 1, 3 (Tex. Crim. App. 1993). 

 A person commits the offense of murder if he intentionally or knowingly causes the death
of an individual or if, intending to cause serious bodily injury, he commits an act clearly dangerous
to human life that causes the death of an individual. Tex. Pen. Code Ann. § 19.02(b) (Vernon
1994). 

 A person is criminally responsible as a party to an offense if the offense is committed by his
own conduct, by the conduct of another for which he is criminally responsible, or by both. Tex. Pen.
Code Ann. § 7.01(a) (Vernon 1994). A person is criminally responsible for an offense committed
by the conduct of another if, acting with intent to promote or assist the commission of the offense,
he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Tex.
Pen. Code Ann § 7.02(a)(2).

 Mere presence at the scene of a crime is not alone sufficient to prove that a person is a party
to the offense, although it is a circumstance tending to prove guilt which, combined with other facts,
may suffice to show that the accused was a participant. Beardsley v. State, 738 S.W.2d 681, 685
(Tex. Crim. App. 1987); Barnes v. State, 62 S.W.3d 288, 297 (Tex. App.-Austin 2001, pet. ref'd). 
 To convict a defendant as a party, the evidence must show that, at the time of the offense, the parties
were acting together, each contributing some part toward the execution of their common purpose.
Pesina v. State, 949 S.W.2d 374, 382-83 (Tex. App.-San Antonio 1997, no pet.). While an
agreement of the parties to act together in common design seldom can be proved by direct evidence,
reliance may be had on the actions of the parties, showing by either direct or circumstantial evidence
an understanding and common design to do a certain act. Id. at 383. In determining whether a
defendant participated in an offense as a party, the court may examine the events occurring before,
during, and after the commission of the offense and may rely on actions of the defendant that show
an understanding and common design to commit the offense. Ransom v. State, 920 S.W.2d 288,
302 (Tex. Crim. App. 1994). The accused must know that he is assisting in the commission of the
offense. Pessina, 949 S.W.2d at 382. Intent may be inferred from circumstantial evidence such as
the acts, words, and conduct of the accused. Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App.
1995). In determining the sufficiency of the evidence to show an appellant's intent, and faced with
a record that supports conflicting inferences, we must presume--even if it does not affirmatively
appear in the record--that the trier of fact resolved any such conflict in favor of the prosecution, and
we must defer to that resolution. See Matson v. State, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

Legal Sufficiency

 The standard of review for legal sufficiency of the evidence is whether, viewing the evidence
in the light most favorable to the jury's verdict, any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); Lacour v. State, 8 S.W.3d 670, 671 (Tex. Crim.
App. 2000). An appellate court should uphold the jury's verdict "unless it is found to be irrational
or unsupported by more than a mere modicum of evidence." Moreno v. State, 755 S.W.2d 866, 867
(Tex. Crim. App. 1988). The jury is the exclusive judge of the credibility of the witnesses and of
the weight to be given their testimony. Barnes v. State, 876 S.W.2d 316, 321 (Tex. Crim. App.
1994). Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the
jury. Losada v. State, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). 

 We view the evidence of Appellant's intent to promote the offense or assist David in the
commission of the offense in the light most favorable to the verdict. As recounted above, Justin
testified that Appellant drove the Mazda Protege behind, in front of, and beside Tony's truck for
several miles after Tony inadvertently cut him off in traffic. Justin said that Appellant was looking
at Tony and Justin in the rearview mirror when the Protege was in front of the truck and gesturing
with his hands during that time. Justin testified that Appellant sped away after Tony was shot.

 The State produced two witnesses who were driving on Woodforest just prior to the murder
and saw the Protege and the truck. Michelle Avalos ("Avalos") first noticed the Protege when it
passed her driving "reckless[ly]." She stopped behind the car at a red light and observed the driver
"dancing" in his seat. When the light changed, Avalos saw the pickup truck tailgating the Protege,
and then she saw the two vehicles stopping side-by-side, with the car to the left of the truck, at the
next traffic light. Avalos turned off of Woodforest into her apartment complex and did not see the
shooting.

 Maria Galindo ("Galindo") was stopped in her car at the red light at Grand Oaks Boulevard
and Woodforest immediately prior to the murder. Galindo was directly in front of Tony's truck, and
she saw the Protege beside the truck. Galindo noticed that the occupants of the two vehicles were
arguing and gesturing angrily to one another. As the light turned green, Galindo saw the passenger
lean out the window of the car. She heard a loud boom, saw smoke, saw the truck veer off across
the road into the fence, and saw the Protege "zoom" away without stopping.

 The State produced several witnesses who testified about what Appellant and David told
them about the crime. James Chaney ("Chaney") testified that he was in the Harris County jail in
October of 1999. Chaney heard Appellant talking about a murder and asked if it was the
"Northshore murder." Appellant said it was and shared his concerns about the case against him with
Chaney. He told Chaney that the weapon had not been recovered but that he had left a box of bullets
in the car. Appellant said the authorities did not have an accurate description of the car. (2) Appellant
also told Chaney that when he heard that a witness had seen an elementary school honor student
sticker on the car, he removed the sticker and washed the car. Chaney testified that Appellant "just
wanted to make sure that nobody could put anything on him." Appellant asked Chaney whether he
knew if the fact that a bullet hit glass before hitting the victim affected ballistics evidence. He asked
whether Chaney believed that the authorities could prove the case against him. He told Chaney that
he and David had agreed not to talk to the police. Appellant told Chaney that he believed that
"Willie" had "snitched" on him. 

 Willie Cater ("Cater") testified that after seeing news reports about the murder, including a
sketch of the passenger and a description of the Protege, he deduced that Appellant and David had
committed the crime. When he saw David, Cater jokingly referred to him as "Killer," and David
thereafter described the offense in some detail to Cater. According to Cater, David said he was
riding with Appellant on Woodforest when they encountered the truck. David said the driver of the
truck was "mad dogging" them and giving them disparaging looks, so David told Appellant to "chase
that fool." When the two vehicles came to a red light, Appellant wanted to get out and fight with
Tony, but David told Appellant, "No, you don't need to do it like that. I got this." David told Cater
that he showed Appellant a gun. As the traffic light turned green, David shot at Tony, and Appellant
"burned off." David did not tell Cater whether Appellant tried to prevent or discourage the shooting.

 Cater testified that he saw Appellant in jail some time later. Appellant accused Cater of
being a "snitch," but admitted to Cater that he was driving when David shot Tony and that he sped
away. 

 Harris County Sheriff's Deputy Harold Moore testified that in the spring of 2000, he was
working as security officer for a group of inmates, including Appellant, who had been taken to the
hospital for various injuries and ailments. Deputy Moore overheard Appellant discussing the murder
with the other inmates. Deputy Moore said Appellant was "nonchalant, kind of bragging . . .
speaking real loud . . . [so that] anybody could hear that was in the close proximity of him. [H]e
wasn't trying to hide it." Deputy Moore asked Appellant whether he had been involved in the
shooting, and Appellant responded that he had been. Deputy Moore told Appellant that Tony was
his godson, and Appellant got quiet. Later that day, Appellant approached Deputy Moore and asked
to speak to him privately. Appellant told Deputy Moore that on the day of the murder, he was
driving, and David was riding with him. Appellant said Tony cut him off, and then David had a
verbal confrontation with Tony as the two vehicles continued to drive alongside one another for three
or four blocks. Appellant said that when he stopped at a red light, he leaned down to adjust the radio
and heard a gunshot. Appellant looked up to see that his brother had shot Tony, and he sped away
and did not return.

 Under the court's charge, the jury was authorized to convict Appellant of murder as a party
to the offense if it found beyond a reasonable doubt that Appellant, acting with intent to promote or
assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid
David, who was acting with the intent to cause serious bodily injury to Tony, to intentionally or
knowingly commit an act clearly dangerous to human life, namely to shoot Tony with a firearm. The
evidence showed that Appellant, driving recklessly and gesturing angrily, maneuvered the Protege
around all sides of Tony's truck over several minutes and some distance, finally coming to a stop
with David, who was wielding a handgun and stating his intention to use it, directly beside Tony.
After David leaned out of the car and fired the fatal shot, Appellant sped away from the scene and
did not return. Subsequently, Appellant washed the car and removed an identifying bumper sticker. 
Later, after both Appellant and David had been arrested, they agreed not to talk to the police about
the case. Viewing the evidence of Appellant's actions before, during, and after the murder in the
light most favorable to the verdict, we conclude that any rational trier of fact could have found
beyond a reasonable doubt that Appellant and David were acting together, each contributing some
part toward the execution of their common purpose, when David intentionally shot Tony. Therefore,
we hold that the evidence is legally sufficient to support the Appellant's conviction.

Factual Sufficiency

 When reviewing the factual sufficiency of the evidence, we must ask whether a neutral
review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is
so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt,
although adequate if taken alone, is greatly outweighed by contrary proof. Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000). We review the evidence weighed by the jury that tends to
prove the existence of the elemental fact in dispute and compare it with the evidence that tends to
disprove that fact. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). We review the fact
finder's weighing of the evidence and are authorized to disagree with the fact finder's determination. 
Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). This review must employ appropriate
deference to prevent an appellate court from substituting its judgment for that of the fact finder, and
any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the
weight and credibility to be given to the testimony of the witnesses. See Jones, 944 S.W.2d at 648.

 Our neutral review of the record reveals some evidence that Appellant did not intentionally
promote or assist in the commission of the murder. Appellant told Cater that he wanted to fight
Tony, but did not know that David was going to shoot Tony. Appellant told Deputy Moore much
the same thing, and he told the deputy he was adjusting the radio when he heard the gunshot. Also,
Appellant told Deputy Moore and Chaney that he wanted to apologize to Tony's parents, and Deputy
Moore described Appellant's demeanor as "remorseful." However, we must presume that the jury
resolved any conflicting inferences regarding Appellant's intent, or lack thereof, against Appellant. 
Matson, 819 S.W.2d at 846. We conclude that the proof of guilt is neither so obviously weak as to
undermine confidence in the jury's determination, nor greatly outweighed by contrary proof. We
hold that the evidence is factually sufficient to support the conviction. Therefore, Appellant's first
issue is overruled.


The Right to Confrontation

 In his second issue, Appellant argues that the trial court erred by admitting hearsay evidence
thereby effectively denying Appellant his constitutional right to confrontation.

 The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal
prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." 
U.S. Const. amend. VI. The central purpose of the Confrontation Clause is to ensure the reliability
of the evidence against an accused through rigorous testing in an adversary proceeding before the
trier of fact. Maryland v. Craig, 497 U.S. 836, 845, 110 S. Ct. 3157, 3163, 111 L. Ed. 2d 666
(1990).

 Our rules of evidence also ensure that the evidence against an accused will be reliable, and,
under the rules of evidence, therefore, hearsay is generally not admissible. See Tex. R. Evid. 802.
Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing,
offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). 

 Appellant contends that because he could not cross-examine David, his right to confrontation
was violated when hearsay statements made by David which implicated Appellant in the murder
were introduced through the testimony of Cater and Henry Gates ("Gates"). David's statements were
clearly admissible against David as admissions by a party opponent, and such admissions are not
hearsay. See Tex. R. Evid. 801(e)(2). Whether David's hearsay statements are admissible against
Appellant is another matter. 

 Our close examination of Gates's testimony does not reveal any hearsay statements by David
which implicate Appellant. David had sold the murder weapon to Gates, and Gates testified about
David's efforts to get the gun back from him. Gates testified that he got a feeling from what David
said that Appellant wanted the gun back, but Gates specifically testified that "[David] never said he
was told [by Appellant] to do anything with the gun." Gates testified, "I just felt like [Appellant]
was advising him to get it back from me." Gates testified that Appellant himself told Gates that he
wanted David to get the gun back and that Appellant did not want Gates to sell the gun to anyone
else. Gates did not testify to any hearsay statements by David which implicated Appellant in the
murder. The only statement testified to by Gates which incriminated Appellant was Appellant's own
statement to Gates which was clearly admissible against Appellant. See Tex. R. Evid. 801(e)(2).

 On the other hand, David's hearsay statements to Cater implicated Appellant to some degree. 
As detailed above, David had described the murder to Cater, and Cater recounted David's story to
the jury. Appellant objected to Cater's testimony about what David told him Appellant said or did
on the bases of hearsay and violation of his right to confrontation. The objection was overruled, and
Appellant was allowed a running objection on the same grounds. Cater testified that David said that
after Tony cut off Appellant in traffic, Tony was antagonizing them, so he told Appellant to chase
Tony, and Appellant did so, changing lanes and swerving to catch up with Tony. David said that
Appellant wanted to jump out of the Protege and fight or "box" Tony at a red light, but David,
wielding a gun, told Appellant, "No, you don't need to do it like that. I got this." David said that
when the traffic light turned green, David shot at Tony, and Appellant said, "I'm getting out of here
man" and sped away from the scene. When asked whether David told him that Appellant tried to
prevent or discourage the shooting after seeing the gun, Cater replied, "No, he never said nothing
like that . . . Well, he didn't go into all that, no." 

 The record does not reveal under what theory the trial court admitted David's hearsay
statements to Cater. An appellate court must uphold a trial court's evidentiary ruling if it is
reasonably supported by the record and is correct under any theory of law applicable to the case. See
State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); Jones v. State, 833 S.W.2d 118, 125 n.
15 (Tex. Crim. App. 1992). The State argues that the statements are admissible under Texas Rule
of Evidence 803(24). Rule 803(24) provides that a statement against the declarant's penal interest
may be admissible if corroborating circumstances clearly indicate the statement's reliability. See
Tex. R. Evid. 803(24).

 If a hearsay statement is admissible under a "firmly rooted" exception to the hearsay rule,
reliability, for purposes of the Confrontation Clause, can be inferred. Idaho v. Wright, 497 U.S. 805,
816, 110 S. Ct. 3139, 3147, 111 L. Ed. 2d 638 (1990). The court of criminal appeals has held that
a statement against penal interest made to a friend or acquaintance is a firmly rooted exception to
the hearsay rule. See Dewberry, 4 S.W.3d at 753; but see Lilly v. Virginia, 527 U.S. 116, 119 S. Ct.
1887, 144 L. Ed. 2d 117 (1999) (plurality opinion) (holding that statements against penal interests
made to police officers were often not trustworthy enough to satisfy the right to confrontation of
witnesses, and are not "firmly rooted" exception to hearsay).

 We review a trial court's decision to admit or exclude a statement under rule 803(24) for an
abuse of discretion. See Bingham v. State, 987 S.W.2d 54, 57 (Tex. Crim. App.1999). In order for
a declaration against interest to be admissible under Rule 803(24), the statement must be
self-inculpatory and sufficiently corroborated by circumstances tending to show the trustworthiness
of the statement. Dewberry, 4 S.W.3d at 751. An admission against the declarant's penal interest
may be admissible against a co-defendant so long as it is sufficiently against the declarant's own
interest to be reliable. See Id.

 Because David took responsibility for initiating the chase, possessing the weapon, and
perpetrating the actual shooting, David's hearsay statements to Cater were sufficiently self-inculpatory to be reliable. Cf. Guidry v. State, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999) (holding
that statement which was not equally against declarant's and defendant's interests, but actually
shifted blame from declarant to defendant, did not reach level of reliability required by Dewberry.)
We must next determine whether the statements were sufficiently corroborated to indicate their
trustworthiness. We consider a number of factors including (1) whether guilt of the declarant is
inconsistent with guilt of the defendant, (2) whether the declarant was so situated that he might have
committed the crime, (3) the timing of the declaration, (4) the spontaneity of the declaration, (5) the
relationship between the declarant and the party to whom the statement is made, and (6) the
existence of independent corroborative facts. Dewberry, 4 S.W.3d at 751.

 We note first that Appellant's guilt as a party is not inconsistent with David's guilt as the
principal, and David's statements indicate that David himself was the shooter. We note that David
made the hearsay statements to Cater about three weeks after the murder on the second occasion on
which he had seen Cater since the murder. The statements were made spontaneously as David
pondered the fact that Cater had figured out David and Appellant had committed the crime. We note
that David and Cater were friends, and the setting in which the statements were made was apparently
social and congenial. Furthermore, the statements were made to Cater before David and Appellant
were suspects in the case. All of these factors tend to indicate the trustworthiness of the statements.

 Next, we look to the record for independent corroboration of David's statements. The
following testimony corroborated David's statements: (1) that Tony pulled out in front of the
Protege is corroborated by Justin's testimony, (2) that Appellant was the driver of the Protege on that
day is corroborated by the testimony of Justin and Avalos and by Appellant's own statements to
Chaney, Cater, and Deputy Moore, (3) that Appellant chased Tony is likewise corroborated by the
testimony of Justin and Avalos and by Appellant's own statements to Cater and Deputy Moore, (4)
that Tony was antagonizing David and Appellant is corroborated by the testimony of Galindo and
Avalos, (5) that Appellant wanted to fight or "box" Tony is corroborated by Justin's and Galindo's
testimony that Appellant was shouting and gesturing to Tony and by Appellant's own statements to
Cater and Deputy Moore, (6) that David shot Tony is corroborated by the medical examiner's
testimony that Tony died from a gunshot wound to the head, and (7) that Appellant sped away from
the scene after the shooting is, again, corroborated by the testimony of Justin and Galindo and by
Appellant's own statements to Cater and Deputy Moore. 

 Appellant contends that the fact that David showed the gun to Appellant and stated his
intention to use it cannot be corroborated by the record. We disagree. The testimony in the record 
that Appellant recklessly maneuvered the Protege through the traffic so that David was directly
beside Tony at the red light, and that David physically leaned out of the window of the small car
toward Tony, corroborates Appellant's knowledge of David's intent to use the gun. Considering this
evidence along with the foregoing evidence indicating the reliability of David's statements, we
conclude that David's hearsay statements to Cater were sufficiently reliable that they were admissible
against Appellant under Rule 803(24). Therefore, we hold that the trial court did not abuse its
discretion by admitting the hearsay statements. Appellant's second issue is overruled.


Severance 

 In his third issue, Appellant contends that the trial court erred by refusing to grant his motion
to sever. Two or more defendants who are jointly or separately indicted or complained against for
the same offense or any offense growing out of the same transaction may be, in the discretion of the
court, tried jointly or separately as to one or more defendants. Tex. Code Crim. Proc. Ann. art.
36.09 (Vernon 1981). In cases in which, upon timely motion to sever and evidence introduced
thereon, it is made known to the court that a joint trial would be prejudicial to any defendant, the
court shall order a severance as to the defendant whose joint trial would prejudice the other
defendant. Id.

 A trial court has considerable discretion in deciding whether a joint trial would be so
prejudicial to a particular defendant that a severance should be ordered. Hudson v. State, 794
S.W.2d 883, 885 (Tex. App.-Tyler 1990, no pet.). The defendant has the heavy burden of showing
clear prejudice resulting from the denial of a request for severance. Id. 

 The prejudice which Appellant claims resulted from the trial court's refusal to sever is that
David's hearsay statements which incriminated Appellant were admitted into evidence, and
Appellant could not cross-examine David. Because we found no error in the admission of David's
hearsay statements against Appellant, we cannot say that Appellant has met his burden of showing
prejudice sufficient to require severance. Accordingly, Appellant's third issue is overruled.


Proceeding With Eleven Jurors

 In his fourth issue, Appellant contends that the trial court erred by dismissing a juror during
the punishment phase of the trial over his objection. 

 Not less than twelve jurors can render and return a verdict in a felony case. Tex. Code Crim.
Proc. Ann. art. 36.29 (Vernon Supp. 2002). However, after the trial of any felony case begins and
a juror dies or, as determined by the judge, becomes disabled from sitting at any time before the
charge of the court is read to the jury, the remainder of the jury shall have the power to render the
verdict. Id. The determination as to whether a juror is disabled is within the discretion of the trial
court, and absent an abuse of that discretion, no reversible error will be found. Brooks v. State, 990
S.W.2d 278, 286 (Tex. Crim. App. 1999). However, the exercise of the trial court's discretion is
limited to situations where there exists some physical illness, mental condition, or emotional state
which hinders one's ability to perform one's duties as a juror. Landrum v. State, 788 S.W.2d 577,
579 (Tex. Crim. App. 1990).

 The trial judge stated for the record that the juror's mother suffered a heart attack on the first
day of the punishment phase of the trial. The juror came to the courthouse before trial was set to
begin the next day and informed the judge that she needed to be with her mother who was scheduled
for surgery that morning. The judge detained the juror in the jury room until he informed the parties
that he intended to release the juror. The judge recounted the juror's mother's very critical condition
and noted that the juror "just cannot continue to serve [because] she must go and be with her
mother." The judge said, "I now find that it is impossible for [the juror] to continue serving as a
juror." Appellant was afforded an opportunity to question the juror before she was released but did
not do so. Appellant's objection to proceeding with eleven jurors was overruled, and the trial
continued. 

 Because the court's charge on punishment had not been read to the jury, it was within the trial
judge's discretion to release the juror. Rojas v. State, 986 S.W.2d 241, 249 n. 7 (Tex. Crim. App. 
1998). The judge was in the best position to evaluate the juror's mental condition and emotional
state. Where Appellant declined to question the juror, and where the judge made detailed remarks
on the record recounting the juror's circumstances and his findings, we cannot say that the trial judge
abused his discretion by releasing the juror. Appellant's fourth issue is overruled. 

 The judgment is affirmed.


 SAM GRIFFITH 

 Justice

Opinion delivered May 22, 2002.

Panel consisted of Worthen, J., and Griffith, J.


(DO NOT PUBLISH)
1. Justin estimated the distance to be three or four miles, but the record is unclear as to the actual distance.
2. Justin told the police that the Mazda Protege involved in the shooting was dark green. Appellant's
girlfriend's Mazda Protege was black.