# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00694-CR

**Timothy Doan Payne, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 57383, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Timothy Doan Payne of the offense of capital murder. *See* Tex. Penal Code Ann. § 19.03 (West Supp. 2008). Punishment was assessed at life imprisonment. In two issues on appeal, Payne challenges the legal and factual sufficiency of the evidence supporting his conviction. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that, on November 26, 2004, police officers discovered the bodies of Haitham Zayed and Mohamed-Amine Rahmouni ("Amine") lying on the ground next to an automobile. The car was located in a parking lot of an electric company just outside the Killeen city limits. It appeared that both men had been shot. Autopsies revealed that Zayed had died from a single gunshot wound to the back left side of his head. Amine had suffered two gunshot wounds

to his face, either one of which, according to the testimony of medical examiner Jill Urban, would have been enough to cause death.

During the investigation into the shootings, authorities identified Richard Tabler as a person of interest. When officers arrested Tabler on an unrelated theft charge, they questioned him about the shootings. According to the testimony of Investigator Tim Steglich of the Bell County Sheriff's Office, Tabler provided three contradictory statements during the course of his interview. Initially, Tabler claimed that Payne had committed the murders and later divulged that fact to him. Subsequently, Tabler admitted to being present during the murders but denied participating, and instead implicated Payne. Ultimately, Tabler admitted to shooting and killing Zayed and Amine while Payne was present.

Tabler explained that he had decided to kill Amine because, according to Tabler, Amine owed him money and had threatened to kill his family. At around midnight, on November 25, 2004, Tabler had called Amine and told him that he had some stereo equipment he wanted to sell to him. The pair arranged to meet in a parking lot later that night. Prior to meeting Amine, Tabler retrieved a Ruger 9-millimeter pistol from the residence of his girlfriend, Kim Marmie.[1]

According to Tabler, Amine arrived at the meeting location in an automobile driven by Zayed. Tabler, accompanied by Payne, arrived in a pickup truck. Tabler approached the other vehicle and, after a brief conversation, shot Zayed in the head. Then, Tabler claimed, he shot Amine

---

[1] Between the time of the shootings and trial, Marmie married another man and changed her last name to Geary. To avoid any confusion, we will refer to the witness by her first name.

2

in the head, pulled Amine out of the vehicle, and searched Amine and the vehicle for money. Tabler further recounted that because Amine was still alive, he shot him again.

According to Tabler, Payne was with him during the shootings, knew that Tabler planned on killing Amine, and videotaped Tabler shooting Amine the second time. Tabler also stated that Payne later helped destroy the videotape of the shooting.

Based on information that Tabler provided, officers proceeded to Kim's residence to search for the murder weapon. Payne was present at Kim's house when the police arrived. During the search of Kim's house, Payne approached Detective Alex Gearhart of the Killeen Police Department and told him that Gearhart could find the gun in the garage. Payne proceeded to tell Detective Gearhart that he had information concerning the murders. According to Gearhart, Payne was "shaking" when he spoke with him. Gearhart asked Payne if he wanted to "voluntarily take a ride" to the Bell County Sheriff's Office and provide a written statement. Payne agreed.

Payne's statement, which was admitted into evidence, provided a detailed account of events on the night of the shootings. In the statement, Payne explained that he had been with Tabler and other people at Kim's house on the night of November 25, 2004. Tabler announced that he had "some stuff [he] need[ed] to take care of" and asked Payne and Chris Elston to "come along." The group got into a pickup truck that Tabler had borrowed from a friend, and, with Tabler driving, they departed from Kim's house. While they were on the road, Tabler informed Payne and Elston that they were looking for Amine, who "had some money" that he was going to give Tabler. They first drove to a strip club that Amine managed. When they arrived, Tabler sent Payne inside to find Amine. Unable to find Amine inside the club, Payne returned to Tabler's vehicle, and the three men drove away. While they were driving, Tabler asked Payne and Elston "if [they] were afraid to kill

3

somebody." Elston told Tabler, "It isn't my top priority[,] but if I have to I will." Payne told Tabler, "I don't know, yes[,] I could probably kill somebody."

Shortly thereafter, Elston asked Payne and Tabler to drop him off at Kim's house. After doing so, Payne and Tabler drove to Amine's house and talked to Amine's sister. They asked her to contact Amine and tell him to call them. After they left Amine's house, Tabler asked Payne to call the club and again inquire as to Amine's whereabouts. Payne did so.

While Payne and Tabler continued driving, Amine, according to Payne, called Tabler and told him that he had $1,500 with which to buy stereo equipment.[2] Shortly thereafter, Tabler called Elston to set up a drug buy "for $500 in X pills and $500 in cocaine."[3] According to Payne, Tabler told Elston "that he would have the money later on that night." After Tabler finished talking to Elston, Amine called Tabler a second time, this time to arrange a meeting place. After Tabler got off the phone with Amine, he told Payne "that he was not selling [Amine] anything but he was going to take his money and if he did not give it to him he was going to shoot him."

According to Payne, he and Tabler waited at the meeting place "for like a half hour." While they were waiting, Amine called Tabler, told him that he was running late, but "he would be right out." Payne and Tabler "waited a little longer" until Amine arrived at approximately 2:30 or 3:00 a.m. Payne observed that "somebody else was driving" the vehicle in which Amine arrived.

---

[2] Payne's statement does not indicate whether Amine and Tabler had previously discussed such a sale, but, according to Tabler, in addition to managing a strip club, Amine bought and sold stolen audio equipment. Tabler was apparently one of Amine's suppliers for such equipment. In his interview with the police, Tabler claimed that Amine owed him $2,500 for some equipment that Amine had supposedly purchased from Tabler.

[3] There was evidence that, at relevant times, Tabler and Elston bought and sold drugs to and from each other.

4

Payne continued that Tabler and the driver started talking. Tabler demanded to see "the money." After the driver refused, Payne "heard two shots." Then, Payne recounted in his statement:

> . . . Richard [Tabler] yells out 'open the doors on the car.' Then I opened the passenger door. Richard then said look in his pockets and see if he has any money. Richard was on the driver's side looking in his pockets. Then he said look in Amine's pockets. I then stick my hand down in his pocket while he is still in the car and his head fell over on my sleeve of my left arm. I said then man lets go. He said No I not leaving yet. Richard then came to the passenger side and pulled Amine out onto the ground. He said flip him over and I said no man I ain't going to lets leave. He said do it and we can leave. I grabbed Amine's shirt and pants and flipped him over onto his back. Richard then searched him. He told me to get the seatbelt off the guy in the driver's seat. I then went over there and I was freaking out and I cut the seatbelt off. Richard told me to watch and see if no cars were coming. He pulled the driver out of the vehicle. He said there wasn't any money in the vehicle. He said get the video camera. So I got the video camera. He told me to record him. So I started to record him. Richard said something to Amine. I don't know what it was but it was because Amine was not talking but he was gurgling and had his hand risen up in the air. Then Richard shot him again in the head just once. Then I get back in the truck. Richard grabs a bag from the car and puts it in the truck. We then left and headed toward Kim's house.

Payne went on to describe events after he and Tabler arrived at Kim's house. According to Payne, they went to a bedroom, where Tabler threatened to "do the same thing" to Payne if he told anyone about the shootings. Kim then entered the room, Tabler told her what had happened, and they played the videotape for her. According to Kim's testimony, the videotape showed Tabler pulling Amine out of the car and shooting him while saying, "Who has the power now?" After showing Kim the videotape, Payne recounted, Tabler told Payne to get rid of the black bag that he had recovered from Amine's vehicle. Payne "threw it in the dumpster" at a store. The

5

next day, according to Payne, they destroyed the videotape. Payne and Tabler also "took the truck out and cleaned it out and washed it up at a car wash."

Kim also testified about her recollection of events at her house before and after the shootings. Her testimony was largely consistent with the events Payne had described in his statement. Additionally, Kim testified about the relationship between Tabler and Payne. According to Kim, "They were inseparable. They seemed like they were the best of friends." When asked how Tabler and Payne were acting when they told her about the shootings, Kim testified, "They seemed fine. They . . . weren't shaken up or anything." Kim also noticed that Payne's shirt "had a lot of blood spots all over it." When watching the videotape, Kim perceived that Amine had still been alive when Tabler had pulled him out of the car. Kim further testified that Tabler threatened to "shoot every single person in the living room" if she told anybody about what she saw on the videotape or what had happened.

Chris Elston also testified. Elston testified that, at the time of the shootings, he had been selling drugs to Tabler. Elston had met Payne through Tabler. According to Elston, Payne and Tabler hung out together and appeared to be friends. When asked if Tabler "bossed [Payne] around," Elston testified, "No, sir." Elston also testified that, on the night of the shootings, prior to the three of them leaving Kim's house to find Amine, Tabler had told him that he was going to get money from Amine so that he could arrange a drug buy with Elston. While they were in the truck looking for Amine, Elston saw that Tabler had a gun on him. Elston further testified that he did not know how the topic of "killing somebody" had come up. However, although both Elston and Payne were serving in the military at the time, Elston did not believe Tabler was referring to "military stuff."

6

Payne testified in his own defense. Payne testified that he "didn't know what was going on" when he was with Tabler on the night of the shootings, and he was "just taking a ride." Payne claimed that he "had nothing to do with" Tabler's plan to buy drugs from Elston. Payne also denied having an agreement with Tabler to rob and shoot Amine. Payne acknowledged, however, that Tabler had told him "that he wasn't selling Amine stolen equipment, that if he didn't give him the money he was going to shoot him." Payne also testified that he knew Tabler had a gun on him.

On cross-examination, the State questioned Payne about his relationship with Tabler. Payne testified that he had met Tabler at a strip club approximately two weeks prior to the shootings. Payne could not remember what he and Tabler had discussed when they were together, but acknowledged that "drugs could have come up." Payne admitted that both he and Tabler were using drugs at the time they met.

The State also questioned Payne extensively about the events on the night of the shootings. Payne again denied knowing about the drug deal previously arranged between Tabler and Elston. He did, however, remember Tabler calling Elston to order $500 worth of ecstasy and $500 worth of cocaine. When asked about Tabler's question to him and Elston regarding whether they could "kill somebody," Payne testified that he did not know what Tabler was talking about. However, Payne admitted that he knew Tabler was trying to find Amine, that Tabler was wanting to get money from Amine, and that Tabler had a gun on him.

When asked about his response when Tabler said that he was going to shoot Amine if Amine did not give him the money, Payne testified, "I didn't say anything." Payne claimed that, "at that time," he did not believe Tabler was going to shoot Amine. When asked why he did not believe Tabler, Payne testified that Tabler "was a big talker" and was "just saying things at the time."

7

Payne also denied, contrary to his written statement, that he had put his hand in Amine's pocket after Amine had been shot. Payne further denied remembering what he and Tabler discussed during the drive back to Kim's house. When asked whether he had thought he ought to tell somebody about the shootings, Payne testified, "I don't remember what I was thinking exactly, sir. I don't remember." Payne admitted that, on Saturday, November 27, less than two days after the shootings, he, Tabler, Kim, and others "were drinking and partying" at Kim's house.

Payne also admitted that, when the police showed up at Kim's house on November 29, he had been "shaking" as he spoke with Detective Gearhart, but Payne testified that he did not know why he was shaking. Payne denied that it was because he had just "been caught" for "assisting in the murders." The State then pursued the following line of questioning:

Q: What did you assist in?

A: Didn't assist in anything, sir.

Q: Not at all?

A: No, sir.

Q: Did you help Richard Tabler find Amine Rahmouni?

A: Yes, sir.

Q: Did you videotape Richard Tabler killing Amine Rahmouni?

A: Yes, sir.

Q: Did you know from the very beginning that Richard Tabler always carried a gun?

A: No, sir.

. . . .

8

Q:      Did you know he had a gun on the night of the 25th?

A:      I did find out when I was in the truck, yes, sir.

. . . .

Q:      During any of this time, any of those four plus days, if you didn't do anything to assist in this crime, why didn't you tell somebody?

A:      I was in shock, sir. I was panicking. I didn't know what to do.

Q:      For four days?

A:      That's correct, sir.

Q:      Did the cocaine and alcohol help the shock?

A:      Probably, sir.

. . . .

Q:      So any time what you're telling this jury is beginning around 10:30 p.m. before you got in that silver Dodge pickup and apparently up through 7 a.m., November 29th of 2004, when you finished the statement with Investigator Stinehour, your mind wasn't right during any of that period of time?

A:      Excuse me, not really, sir.

In its closing argument, the State argued that Payne was guilty of capital murder because he either (1) assisted Tabler in committing the murders, or (2) conspired with Tabler to rob Amine, and the murders occurred in the furtherance of that conspiracy. Defense counsel argued that Payne had not had the requisite intent to assist in the commission of the murders. The jury, having been instructed on the law of parties, found Payne guilty of the offense of capital murder. Punishment was automatically assessed at life imprisonment. This appeal followed.

9

## STANDARD OF REVIEW

When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007); *Shams v. State*, 195 S.W.3d 346, 347 (Tex. App.—Austin 2006, pet. ref'd) (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a trier of fact was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We "must be cognizant of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury." *Lancon v. State*, 253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008). A verdict should be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust. *Id*. at 705; *Korell v. State*, 253 S.W.3d 405, 412 (Tex. App.—Austin 2008, pet. ref'd).

**DISCUSSION**

A person commits the offense of capital murder if he murders more than one person during the same criminal transaction. Tex. Penal Code Ann. § 19.03(a)(7). Payne was charged as a party to the offense under two different theories of criminal responsibility. Section 7.02(a)(2) of the penal code provides that a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id*. § 7.02(a)(2) (West 2003). Section 7.02(b) provides that if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. *Id*. § 7.02(b).

Payne asserts that the evidence is legally and factually insufficient to sustain his conviction for capital murder because, according to Payne, he undertook "no action prior to or during the shootings to make himself a party" to the offense. In reviewing the sufficiency of the evidence under section 7.02(a)(2) of the penal code, we look at the "events occurring before, during, and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction." *Id*. Intent may be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Id*. at 50.

11

As support for his argument that the evidence is insufficient to prove that he acted as a party to the murders, Payne relies on the decision of the San Antonio Court of Appeals in *Pesina v. State*, 949 S.W.2d 374 (Tex. App.—San Antonio 1997, no pet.). In *Pesina*, the defendant was convicted of murder under the law of parties. *Id*. at 376-77, 382. The evidence showed that the defendant did not participate in the killing of the victim, but he came upon the crime scene while the victim was either dead or dying, and he assisted the killers in covering up the crime. *See id*. at 379-81. The appeals court reversed the conviction, finding that there was insufficient evidence to prove that the defendant was a party to the murder. *Id*. at 385. The court concluded, "One's act committed after the offense is completed cannot make him a party to the offense." *Id*. at 383.

Payne asserts that his case is similar to *Pesina* in that "all of the actions" he committed in relation to the murders "occurred after the shooting," and that he was "merely present" at the crime scene. We disagree. The jury heard evidence of the following:

- Payne accompanied Tabler to find Amine. Under Tabler's direction, Payne searched for Amine inside the strip club that Amine managed. Later that night, again under Tabler's direction, Payne called the club to inquire about Amine's whereabouts. Payne also accompanied Tabler to Amine's house and asked Amine's sister to have Amine contact them.

- Tabler asked Payne and Elston "if [they] were afraid to kill somebody." Payne answered, "I don't know, yes[,] I could probably kill somebody." After this conversation, Payne remained with Tabler.

- Payne knew that Tabler wanted "to get money" from Amine, that Tabler had called Elston to set up a drug buy for "later that night," and that Tabler had a gun on him.

- After the meeting with Amine was arranged, Tabler told Payne "that he was not selling [Amine] anything but he was going to take his money and if he did not give it to him he was going to shoot him." In response to this statement, Payne "didn't say anything." He did, however, remain with Tabler.

- When they arrived at the meeting location, Payne waited with Tabler for at least 30 minutes before Amine arrived.

- According to Payne's written statement, after Tabler shot Zayed and shot Amine the first time, but before Tabler shot Amine the second time (and while Amine was apparently still alive), Payne (1) opened the passenger door of Amine's vehicle; (2) searched Amine's pocket; (3) "grabbed Amine's shirt and pants and flipped him over onto his back" so that Tabler could search him; (4) cut the seatbelt off of Zayed so that Tabler could pull him out of the car; and (5) videotaped Tabler shoot Amine the second time.

- Payne disposed of the black bag stolen from Amine's vehicle, helped destroy the videotape of Tabler shooting Amine, and helped clean and wash the truck that Tabler and Payne were driving in during the commission of the offense.

Based on the above evidence, a rational jury could find that Payne was more than "merely present" at the crime scene, and that he engaged in actions before, during, and after the commission of the offense that aided Tabler in committing the murders. A rational jury could also reasonably infer that Payne had the requisite intent to assist Tabler based on Payne's actions in helping Tabler find Amine, his remaining with Tabler for a significant amount of time after Tabler announced that he was "going to shoot" Amine if Amine did not give him the money, his conduct during the shootings in helping Tabler remove and search the victims and videotaping the final shooting, and his actions after the shootings in helping Tabler destroy the evidence. There was also testimony that Payne did not seem "shaken up or anything" when he returned with Tabler to Kim's house. Viewing this and other evidence in the light most favorable to the verdict, we conclude that a rational jury could find, beyond a reasonable doubt, that Payne was guilty of capital murder as a party to the offense pursuant to section 7.02(a)(2).

We reach the same conclusion when viewing the above evidence in a neutral light. The evidence contrary to the verdict consists of Payne's testimony that he was "just along for the

13

ride" and did not believe that Tabler would shoot Amine. Payne also claimed that, during and after the shootings, his actions were motivated by fear that Tabler would "do the same thing to him" if he did not do what Tabler told him to do. The jury, as the sole judge of the credibility of the witnesses, was entitled to disbelieve Payne's denial of responsibility and his self-serving explanations for why he aided Tabler throughout the night. The evidence supporting the jury's verdict is not so weak as to render the verdict clearly wrong or manifestly unjust.

When the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *See Guevara*, 152 S.W.3d at 49; *Greene v. State*, 240 S.W.3d 7, 12 (Tex. App.—Austin 2007, pet. ref'd). Having found that the evidence is legally and factually sufficient under section 7.02(a)(2), we need not consider the sufficiency of the evidence under section 7.02(b).

We overrule Payne's first and second issues.

### CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed: November 7, 2008

Do Not Publish

14